# Green *v.* The State.

## *Indictment for Murder.*

1. *Decision of primary court on issue of fact; when will not be reviewed on appeal.*—Where a defendant in a criminal case moved to quash the indictment on matters *dehors* the record, and set up the same matters in a plea in abatement, and an issue of fact was formed on the averments of the motion and plea, which, by the written consent of the solicitor for the State and the defendant, was submitted to the court for decision, without the intervention of a jury, and the court found the issue in favor of the State, but made no special finding of the facts disclosed by the evidence, the decision of the primary court on the issue of fact, thus formed and tried, will not be reviewed by this court on appeal or writ of error.

2. *Same; when sustained by the record.*—The defendant being a negro, and the issue thus formed being, in substance, whether, in selecting the .grand jury by which the indictment was found, the sheriff, judge of probate and clerk of the circuit court refused to place on the list, or in the box from which juries were drawn, the names of persons of African blood, because of their race and color, and all the testimony introduced on the trial of this issue, which the bill of·exceptions purports to set out, showing affirmatively that no person was excluded from the jury box, or from the jury, on account of his. race, color or previous slavery, and there being an entire absence of testimony that there was in the county a single person of African blood, who possessed the requisite qualifications of a grand juror, but, on the contrary, the testimony of the only two witnesses examined, the sheriff and the clerk, being that there was none such; this court, if the decision of the primary court in favor of the State on this issue could be reviewed on appeal, could not affirm, on any known rule of judicial action, that the officers charged with the duty of drawing the jury have violated that duty, and that the witnesses have sworn falsely, but would be compelled to hold, that. the primary court has made a true finding according to the evidence.

3. *When decisions of United States Supreme Court are binding on this court.*—On all questions arising under the Federal Constitution and the acts of Congress thereunder, the rulings of the Supreme Court of the

[Green v. The State.]

United States are final; and to the law as declared by that court touching such questions, this court has uniformly conformed its rulings.

4. *Fourteenth Amendment of Constitution of United States; a limitation on the powers of the States.*—The Fourteenth Amendment of the Constitution of the United States is, according to its plain language, and the clear exposition of its terms by the Supreme Court of the United States, a limitation on the powers of the States, and not a protection against the wrongs individuals may commit against life, liberty or property; but these are left to State conservation, or provided for elsewhere.

5. *Same; rule of construction.*—After a review of the decisions of the Supreme Court of the United States, construing the Fourteenth Amendment to the Federal Constitution, the query is propounded, whether the true rule of construction is not as follows:　Whenever a State, by its laws as interpreted, denies to any person within its jurisdiction the protection it extends to others, or withholds from any citizen equal privileges and immunities with all other citizens of the United States, then such State violates the amendment; and such violation is complete, whenever an injurious discrimination is expressed in a statute, or is shown in an official act of the executive of the State, or before the judicial department of last resort, when the question comes before the one or the other for official and final action; but if the alleged violation be an act, or failure to act by a subordinate or inferior officer, in a matter not final in its character, but only preparatory or preliminary in its purpose, then it is not the act of the State, and does not violate the amendment, unless it be a matter cognizable before, and brought to the knowledge of the courts, and its redress is denied by that department of the government.

6. *Same; questions to be considered under, which could not otherwise be considered under the statutes of this State.*—It can not be doubted, that the Fourteenth Amendment, the acts of Congress and the rulings of the Federal Supreme Court upon them, require this court to consider questions which, in their absence, could not be considered; and hence, that if, in the drawing and organization of a jury, grand or petit, it was shown by proof on motion, that any citizen of the county, possessing the qualifications prescribed by the statutes of this State, had been left off the panel because of his race or color, it would be the duty of the primary court, before which such motion could alone be made in the first instance, to quash such illegally drawn or summoned panel, or any indictment found by a grand jury thus illegally constituted; but a motion to that end, to be entertained, like any other incidental motion in a cause, should be made, if the objection be to the grand jury, before pleading to the indictment, and if to the venire of the petit jury, before entering upon the trial.

7. *Grand and petit jurors; selection of, and power of the courts over.* In this State, the officers charged with the duty of selecting jurors, grand and petit, as to whom a high standard of qualifications is fixed by statute, must be governed by their opinion and judgment, being equally bound by their oaths to reject persons who, in their opinion, do not possess the requisite qualifications, as to select those who come up to the standard; and this court is forbidden by statute to inquire, in any collateral proceeding, whether or not these officers have judiciously selected a jury list of persons possessing the requisite qualifications.

APPEAL from Macon Circuit Court.

Tried before Hon. JAMES E. COBB.

At the spring term, 1882, of said court, Bill Green, the defendant in that court, appellant here, was indicted for the murder of John Tanner; and at a subsequent term he was tried and convicted of murder in the second degree, and sentenced to

[Green v. The State.]

imprisonment in the penitentiary for twelve years. At the term of the trial, the defendant filed a motion to quash the indictment, and also a plea in abatement, the substantial averments of which are stated in the opinion. The issues of fact formed on the motion and on the plea were, by agreement, tried together by the court, without the intervention of a jury. On the trial the defendant examined as a witness W. P. Thompson, who testified that he was elected sheriff of said county in August, 1880, and was sheriff at the time of the trial; "that, in the summer of 1881, all the names of jurors having been drawn out of the jury box of said county, and it being the time to prepare the jury box as provided by law, he obtained a list of the names to be used in selecting the names of persons to be put in said box, and from which list the names were selected and were put in there, and out of which box so prepared, the juries, both grand and petit, have been drawn since that time for said county; that he obtained none but the names of whites on said list, and knew of none but the names of whites in said box, since he has been sheriff; that he knew of no persons among the colored or African race in said county competent, or having the statutory qualifications for jury duty, but that he never inquired, or tried to find out from others; that he put no names in said box but those of white citizens; that there were a great many negroes living in said county, many of whom rented farms and farm-houses by the year, and most of them engaged in agricultural employment; but whether the negroes exceeded the whites in population, he did not know." The defendant also examined as a witness A. S. Harper, the clerk of said court, who testified that he had been clerk of said court since the latter part of December, 1874; "that his best recollection is that, at the spring term, 1875, and the fall term, 1875, two or three negroes were put on the petit jury, but none since, but that no person of African descent had been selected on the grand jury since he has been clerk; that the names of no persons, so far as he knew, of African descent had ever been put in the box, from which jurors are drawn, since he has been clerk; that there may be a few negroes, in his opinion, competent [to serve] on petit juries in said county, about one in a hundred, perhaps, but that he knew of none, in his opinion, competent to serve as grand jurors; that the negroes exceeded the whites in population in said county of Macon, but that he did not know the proportion." Both of said witnesses testified that "they selected from said list returned by the sheriff the names of such persons as, in their opinion, were competent to discharge the duties of grand and petit jurors with honesty, impartiality and intelligence, and were esteemed in the community for their integrity, fair character and sound judgment; that

[Green v. The State.]

they did not neglect or refuse to put in the jury box the name of any person on account of his race, color or previous condition of servitude; and that such discrimination was not considered or thought of, but this selection was from the list of whites returned by the sheriff, as above stated. The foregoing being all the testimony, the court refused said motion, and held for naught said plea in abatement, as shown by the judgment entry;" and to these rulings the defendant duly excepted, and they are here assigned as error.

BREWER & BREWER, for appellant.

H. C. TOMPKINS, Attorney-General, for the State:

STONE, J.—The only question raised by this record arises out of the organization of the grand jury which preferred the indictment, on which the defendant was tried and the sentence of conviction pronounced. It is not alleged, either in the motion to quash the indictment, or in the plea in abatement, that the jurors were "not drawn in the presence of the officers designated by law."—Code of 1876, § 4889. The defendant, appellant here, is represented as a negro of full blood, and the person, for whose homicide he was tried and convicted, was also a negro. The charges and averments made in the motion to quash the indictment, and in the plea in abatement, are substantially as follows: That the population of Macon county—the county in which the offense is charged to have been committed, and in which the trial was had—was, at the time the indictment was found, about seventeen thousand, of which more than twelve thousand were colored persons of African descent; that of these twelve thousand negroes, there were more than two thousand qualified electors, and eight hundred persons having the requisite qualifications to serve as grand and petit jurors; that for more than eight years, and up to the time of the trial, no person of African descent had been summoned or served on a jury, grand or petit, in Macon county, and the sheriff, judge of probate and clerk of the circuit court, charged with the selection of the grand and petit juries, have selected none but white men, and have invariably declined to select any colored man or person of African descent; that in thus selecting the juries, they have met the unanimous approval of the white people, and the legal profession of the county in particular, which is composed of whites exclusively, and who are opposed to addressing the negroes as "gentlemen of the jury." It will be observed that the *gravamen* of this complaint and motion is, that, in selecting the jury list, the sheriff, judge of probate and clerk of the court refused to place on the list, or in the box from which

[Green v. The State.]

juries are to be drawn, the names of persons of African blood, because of their race and color.

An issue of fact was formed on the averments of the motion and plea, and the record informs us that "the solicitor for the State and the defendant, in open court, and in writing, consented that the court [might] hear and determine the issue without a jury." Thereupon the court did hear the evidence, and found the issue in favor of the State. Can we review and reverse this finding? Many answers can be given to this. The issue was formed on averments of the defendant's own tendering; and it is a well established rule of pleading and practice, to leave parties free to form their own issues, except that the court should not permit persons charged with crime to suffer through the incompetency or faithlessness of counsel. There is no room for suspecting such detriment in this case. If there were, this would present a strong case for appeal to executive clemency, if the court is without power to redress such wrong. It has been the rule with this court from the beginning, not to entertain jurisdiction of appeals from rulings on motions for a new trial.—*Phleming v. State*, Minor, 42; *Franklin v. State*, 29 Ala. 14; 2 Brick. Dig. 276, § 1. The answers: 1. The decision of a primary court on a question of fact, when the intervention of a jury is waived, will not be examined on error. *Noe's Ex'r v. Garner's Adm'r*, 70 Ala. 443; 1 Brick. Dig. 775, § 23, which collects the authorities. We have a statute of recent enactment—Code of 1876, §§ 3029, 3030—which provides that "an issue of fact in a civil case, in any court of common law jurisdiction, may be tried and determined by the court, without the intervention of a jury," when a written consent therefor is filed with the clerk. But, in such case, to authorize a revision, the court must "make a special finding of the facts," upon the request of either party. There was no special finding of facts in this case, and the record does not inform us, that either party requested such special finding to be made. So, if we were to apply the rule in civil cases to this case, we could find nothing to review.—*McCarthy v. Zeigler*, 67 Ala. 43.

2. It will be borne in mind that the issue in this case was formed on the averment of the defendant, that the judge of probate, sheriff and clerk refused to place on the list, or in the box from which juries were to be drawn, the names of persons of African blood on account of their race and color. The bill of exceptions sets out all the testimony that was given on this issue. All the testimony shows affirmatively that no person was excluded from the jury box, or from the jury, on account of his race, color or previous-slavery. And there is an entire absence of testimony that there was, in the county, a single person of African blood, who possessed the requisite qualifica-

[Green v. The State.]

tions of a grand juror. On the contrary, the testimony of the only two witnesses examined, the sheriff and clerk, is that there was none such. It was the duty of the presiding judge to make a true finding. Could he travel beyond the testimony, and on his own knowledge, if he had such, or on conjecture, and against all the evidence offered, find as a fact, not only that there were colored persons in the county who possessed the statutory qualifications of grand jurors, but take a further step and find that three sworn officers had excluded them from the jury box and list on account of their race, or previous condition of servitude? Can these be matters of judicial knowledge? And can we, without a shadow of testimony, affirm that these officers have violated their duty, and their oaths in testifying, and thus reverse the finding of the circuit judge, because he did not, without proof, draw such harsh and illogical inference? All the rules of judicial inquiry will have to be overturned to justify a reversal of this case.

No question is raised on the constitution of the petit jury and we suppose the accused was satisfied with that. There is no error in the record, and the judgment of the circuit court must be affirmed.

We are considering the questions discussed above in the light of the fourteenth amendment to the Constitution of the United States and the decisions upon it, pronounced by the Supreme Court of the United States. We have uniformly, on Federal questions—those in the solution of which the Federal Supreme Court exercises a supervision of our judgments—conformed our rulings to the law as declared by that tribunal. This we have done, because, on all questions arising under the Constitution of the United States, and the acts of Congress thereunder, the rulings of that court are final, to which all State tribunals must yield.—*Nelson v. McCrary*, 60 Ala. 301; *Pollard v. Zuber*, 65 Ala. 628; *Maguire v. Road Commissioners*, 71 Ala. 401. We will not depart from these rulings, however much we may sometimes differ from the reasoning and conclusions of the majority of that court. The language of the fourteenth amendment, pertinent to this case, is, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The first thought which presents itself on reading this amendment is, that it is a limitation on the powers of the States. No State shall commit these abuses. It erects no barrier against the wrongs individuals may commit against life, liberty or property. These, the summation of freedom's attributes, were left to State conservation, or were provided for

[Green v. The State.]

elsewhere. Such is the plain, unmistakable language of the amendment, and such has been the clear exposition of its terms by that high tribunal, which pronounces on such questions in *dernier resort.—Slaughter-House cases*, 16 Wall. 36 ; *U. S. v. Cruikshank*, 92 U. S. 542 ; and the recent case of *United States v. Harris*, opinion by Mr. Justice Woods, (106 U. S. 629,). We will not repeat the strong, fervid language of Justice Miller in the *Slaughter-House cases*, commencing on page 77 of the report. Human sagacity can not predict the clash of jurisdictions, the endless contentions, the usurpations and oppressions which would ensue from the construction he was combatting so eloquently. But what is the legitimate import of that part of the fourteenth amendment which we have copied? Section 2 of Article 4 of the Constitution guarantees to citizens of each State equal privileges and immunities with citizens of the several States. This has been rightly construed as securing each citizen of the United States against hostile, discriminating legislation by States other than his own. No State can pass any law, which secures to its own citizens greater privileges and immunities than it accords to citizens of other States of the Union. It would seem that the first clause of that part of the fourteenth amendment which we have copied, was intended to secure equality of privilege and immunity between the several citizens of one and the same State, and also between its citizens and all other citizens of the United States, without reference to the place of of their residence. Is not this last phase of the provision but a duplication of Section 2, Article 4 of the Constitution as first framed?

The second clause of the amendment under discussion is borrowed from *Magna Charta*, and was embodied in the constitutions of the States from the beginning. It has been so often construed, that further definition would seem unnecessary. " Due process of law," says Mr. Cooley, " undoubtedly means, in the due course of legal proceedings according to those rules and forms which have been established for the protection of private rights. . . . They were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." See also *Zeigler v. S. & N. R. R. Co.*, 58 Ala. 594, and authorities cited. Our statutes secure to every one an equal, fair and impartial trial—provide machinery according to the forms of the common law, and neither in word nor sense, make any discrimination between citizens of the United States, no matter what their race or color. The clauses discussed above have no bearing on this case.

The remaining clause of the fourteenth amendment which we propose to discuss ordains that, " No State shall   .   .

[Green v. The State.]

deny to any person within its jurisdiction the equal protection
of the laws." This, like the second clause, drops the word
citizen, and substitutes the word person. Every person of the
human species—every reasonable creature in being, whether
citizen, alien, enlightened, civilized, or barbarian—falls within
its terms. Each is under the equal protection of the laws.
The State shall make no discriminations. Our statutes make
none. Each offender is liable to the same punishment as all
other offenders in like degree. Each person aggrieved in his
person, reputation or goods, has the same remedies provided
for him as are provided for all others. If persons, by reason
of their want of requisite qualifications, are forbidden to par-
ticipate in the redress of such grievances, they are equally pro-
hibited from taking part in the settlement of controversies be-
tween all others. If the law has confided to one or more
officers or persons the power and duty of discharging a pre-
liminary function in the steps necessary to his trial, it has done
the same thing in all other cases of imputed crime. The law
has prescribed the same rule as applicable to every person of
every nationality, race, character and standing in society, and
requires and expects the same honesty and impartiality in its
administration, no matter who may be its ministers, or where
their ministrations may be felt. Can the State do more to
secure to every person the equal protection of the laws? All
functions of State must be performed by human agencies, from
those of the chief Executive down to the humblest tipstaff who
attends the sittings of the courts. Corrupt and dishonest men
have found their way into all offices, from the highest to the
lowest. Provision is made by law for the prevention and
redress of most, if not all, violations of official trust. But hu-
man law, which speaks in general rules, can not foresee and
forestall all official misconduct. Fraud and malversation seek
out many inventions. The artifice of yesterday will become
known, and be abandoned to-morrow. New laws become neces-
sary to meet and thwart new contrivances, which bad men are
constantly originating. Difficulty of detection must also be
taken into the account. Immoral and dishonest conduct covets
concealment and darkness. Many of the instrumentalities by
which persons charged with crime are brought to trial, are, and
needs must be, confided to officers, whose action is prompted
and shaped by motives we have no means of penetrating. And,
then, courts themselves must conform to rules, and can redress
wrongs, only when brought to their knowledge, and when
clothed with power to inquire into them. They can not violate
the law to prevent its violation by others. Let us refer to
some of the irremediable wrongs that may be, and are encount-
ered in the progress of criminal trials, if not in all contentions

[Green v. The State.]

that are adjudicated in human tribunals, through human instrumentalities. First, let us premise that the fourteenth amendment of the Constitution, although born of the wish to protect the recently emancipated African race from apprehended discriminating, hostile legislation, equally includes the white race under its protecting wing. The State can not—must not—deny to any white person the equal protection of the laws, is as much a mandate of the Constitution, as that such protection should not be denied to the colored race. While guarding the latter race against discriminating, class legislation, the framers of that amendment did not, and could not discriminate against the white race. That would be to deny to it the equal protection of the laws.

There is, and must be, an official discretion, reposed somewhere, to be exercised in furnishing a list or body of names, from which jurors, grand and petit, must be chosen. If the statute specify the qualifications for jury service, and command that jurors, to be selected, must possess such qualifications, then the person or persons charged with the selection must of necessity decide who of the citizens possess the requisite qualifications. Suppose the officer or agent charged with this trust and discretion, exercise it unwisely; or, suppose in its exercise he is guilty of favoritism or fraud, who can know this? The sheriff is frequently called upon to summon a body of men, or a number of talesmen, out of which a jury is to be empaneled. Suppose, in making the selection, he acts ignorantly or corruptly; can the court take judicial knowledge of this, and correct the abuse? Witnesses may give false testimony, juries may render corrupt verdicts, and even judges may be influenced by prejudice or corrupt motives. These are all officers and agencies of the State's administration of the law. Is their conduct the act of the State? Can the State secure infallibility in the administration of its laws? And if it can not, is its failure a denial of the equal protection of the laws? And these inquiries in this State are all the more pertinent, because under the letter of our statutes, enacted long before the emancipation of the blacks, all the preliminary steps in selecting, drawing and organizing grand juries are declared to be directory, and could not become the subject of judicial inquiry, except on the single requisite that the jury shall be drawn in the presence of the proper officers.—Code of 1852, §§ 3470, 3591; Code of 1876, §§ 4759, 4889.

The clauses of the fourteenth amendment to the Constitution which we have been considering, came under review in *Strauder v. West Virginia*, 100 U. S. 303, *Virginia v. Rives*, *Ib.* 313, *Ex parte Virginia*, *Ib.* 339, and *Neal v. Delaware*, 103 U. S. 370. The majority opinion in the first three of the cases was

Vol. LXXIII.

prepared by Mr. Justice Strong; in the latter, by Mr. Justice Harlan. In the case of *Virginia v. Rives*, the complaint was, that a jury, composed entirely of white persons, had been summoned for the trial of a negro. After stating that the laws of Virginia made no discrimination on account of race or color, Justice Strong said: "If, as in this case, the subordinate officer whose duty it is to select juries fails to discharge that duty in the true spirit of the law; if he excludes all colored men solely because they are colored; or if a sheriff to whom a *venire* is given composed of both white and colored citizens, neglects to summon the colored jurors only because they are colored; or if a clerk whose duty it is to take the twelve names from the box rejects all the colored jurors for the same reason, —it can with no propriety be said that the defendant's right is denied by the State, and can not be enforced in the judicial tribunals. The court will correct the wrong, will quash the indictment or the panel, or, if not, the error will be corrected in a superior court. . . . Nor did the refusal of the court and of the counsel for the prosecution to allow a modification of the *venire*, by which one-third of the jury, or a portion of it, should be composed of persons of the petitioners' own race, amount to any denial of a right secured to them by any law providing for the equal civil rights of citizens of the United States. The privilege for which they [the petitioners] moved, and which they also asked from the prosecution, was not a right given or secured to them, or to any person, by the law of the State, or by any act of Congress, or by the fourteenth amendment of the Constitution. It is a right to which every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty or property, there shall be no exclusion of his race, and no discrimination against them because of their color. . . . A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia, or by any Federal statute." These utterances would seem to be in harmony with the rulings in the *Slaughter-House cases* and in *Cruikshank's case*, and would indicate that it is only State action, as distinguished from abuse by an individual, or subordinate official, that can call the powers of the Federal judiciary into exercise under the fourteenth amendment, and the acts of Congress enacted thereunder. Justice Strong, in the same case, had himself said: "The provisions of the fourteenth amendment of the Constitution we have quoted all have reference to State action exclusively, and not to any action of private individuals. It is the State which is prohibited from denying to any person within its jurisdiction the equal protection of the laws." Yet in the next paragraph he says: "It is doubtless true that a State may act through dif-

[Green v. The State.]

ferent agencies—either ·by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment ·extend to all actions of the State denying equal protection of the laws, whether it be action by one of these agencies or another." The language here employed indicates that Justice Strong· had reference to the three departments into which constitutional State Government is divided ; the Executive, represented by the Governor as its head, the Legislative department, and the Judicial department. In *Ex parte Virginia*, he made himself more emphatic. He there said: "A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition ; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." And so in *Neal v. Delaware*, speaking of the authority and conduct of the Levy court in selecting jurors, Mr. Justice Harlan said: "The· act of those officers in the premises is to be deemed the act of the State." He then quotes approvingly the language of Mr. Justice Strong copied above. To us this is strange reasoning. The wrongs spoken of were those committed by any and all officers holding authority under the State, no matter how limited their authority. "Whoever, by virtue of a public· position under a State government," is Mr. Justice Strong's language. We had thought that agents, unless they be of a class called general agents, could not bind their principal beyond the scope of their delegated power, and that those who dealt with them were bound to look to the. extent of their authority. It is conceded, in each of the cases from which we have quoted, that neither Virginia nor Delaware, by their laws, denied to any person the equal protection of the laws. Then the denial was by inferior officers or agencies, and, in thus denying. such equal protection, they transcended their authority, and violated their official duty. The extent of their authority was matter of public law, and all men are charged with a knowledge of the law. How then does it result that the conduct of these subordinate officers, done in excess and in violation ·of their authority, is the act of the State and a violation of the fourteenth amendment by the State?

A few years ago the public mind was startled and shocked by a discovery of the great frauds on the revenue, which had

[Green v. The State.]

been perpetrated by the whiskey ring. One government official was sentenced to the penitentiary for his participation in those frauds and their emoluments, while there was a strong belief that others should have borne him company. The Freedmen's Savings Bank was under the control of government officials. Tens of thousands of recently emancipated negroes were induced to deposit their small accumulations in its vaults, until the aggregate sum on deposit became large. Through mismanagement, if not faithlessness, most of the deposits were wasted and lost. And more recently, a most unsavory odor has issued from the Post-office Department, growing out of what are familiarly known as frauds in the star route service. High government officials are involved in the scandal, and if a tithe of what is sworn to is believed, other sentences to the penitentiary ought to be pronounced. All these offenses have been perpetrated by government officers, and by an abuse of the authority with which they were clothed. Did they thereby become the acts of the Government? Very recently, high officials of the States of Tennessee and Alabama, entrusted with the custody of the treasure of their several States, have each embezzled of the funds in their hands hundreds of thousands of dollars. Did their crime become the act of the State they severally served and betrayed? What a contrast between the arguments of Justices Strong and Harlan, above considered, and the ponderous logic of Mr. Justice Miller in the *Slaughter-House cases*, of Chief Justice Waite in *Cruikshank's case*, of Justice Woods in *Harris' case*, and of Justice Field in his dissenting opinion in *Ex parte Virginia.*

Is not this the true rule?—Whenever the State, by its laws as interpreted, denies to any person within its jurisdiction the protection it extends to others, or withholds from any citizen equal privileges and immunities with all other citizens of the United States, then such State violates the fourteenth amendment of the Constitution. Such violation is complete, whenever an injurious discrimination is expressed in a statute, or is shown in an official act of the executive of the State, or before the judicial department of last resort, when the question comes before the one or the other for official, final determination. But, if the alleged violation be an act, or failure to act by a subordinate or inferior officer, in a matter not final in its character, but only preparatory or preliminary in its purpose, then it is not the act of the State, and does not violate the fourteenth amendment, unless it be a matter cognizable before, and brought to the knowledge of the courts, and its redress is denied by that department of the Government. Till then, can it be said the State has denied to such person the equal protection of the laws?

[Green v. The State.]

In the case of *Neal v. Delaware*, Mr. Justice Harlan uses this language: "The showing thus made, [the petition the prisoner had filed for removal to the Circuit Court of the United States], including, as it did, the fact (so generally known that the court felt obliged to take judicial notice of it) that no colored citizen had ever been summoned as a juror in the courts of the State,—although its colored population exceeded twenty thousand in 1870, and in 1880, exceeded twenty-six thousand, in a total population of less than one hundred and fifty thousand,—presented a *prima facie* case of denial, by the officers charged with the selection of grand and petit jurors, of that equality of protection which has been secured by the Constitution and laws of the United States." In what manner was Mr. Justice Harlan informed of the premises, from which he adjudged this "*prima facie* case of denial"? The petition for removal is copied in the report of the case, and it not only fails to show that there were colored persons resident in New Castle county, the county in which the indictment was found, but it is equally silent as to persons of African blood being residents of the State of Delaware. Nor does the report anywhere show there was any proof on the question. Grand juries are chosen from the body of the county they are required to serve. Can it be affirmed that the Levy court for New Castle county refused to place colored persons on the jury list on account of their color, when there is neither averment nor proof that there were such persons in the county? Courts usually determine questions on pleadings filed, or complaints preferred; and revising courts confine their investigations to questions raised by the record. The decadal dates given in the opinion are at least suggestive, that the information was obtained from census records. Can such information furnish a rule of decision in a revising court on a controverted issue of fact? We had thought in such case, the court is confined to what the record speaks.

We have considered and decided the questions raised by this record, not under our own statutes, for they deny to us all inquiry into the questions as raised. We have done so under the fourteenth amendment of the Constitution of the United States, and the laws of Congress enacted to carry its provisions into effect. We do not doubt that that amendment, the acts of Congress, and the rulings of the Federal Supreme Court upon them, require us to consider questions, which, in their absence, we could not consider. And we would not doubt that, if in the drawing and organization of a jury, grand or petit, it was shown, on motion and proof, that any citizen of the county, and of the United States, possessing the qualifications prescribed by our statutes, had been left off the panel

[Green v. The State.]

because of his race or color, it would be the duty of the primary court, before which such motion could alone be made in the first instance, on sufficient proof of the facts, to quash such illegally drawn or summoned panel, or any indictment found by such illegally constituted grand jury. And such motion might be made by any person affected by the action of such jury, whether of the Arian or African race. Such motion, however, to be entertained, like any other incidental motion in a cause, should be made, if the objection be to the grand jury, before pleading to the indictment, and if to the *venire* of the petit jury, before entering upon the trial. Nor would we, after the case was finally tried in the court below, decline to entertain an appeal from the ruling of that court on such motion. We yield to the rulings of the Federal Supreme Court, in all cases arising under the Constitution of the United States, and the acts of Congress enacted pursuant thereto. We deprecate a clash of jurisdictions.

We will now proceed to expound our statutes bearing on the organization of grand juries, and our rulings thereon, unaffected by the fourteenth amendment. That exposition must still prevail, except to the extent it is altered by said amendment, as hereinabove shown.

The penitentiary system of punishment for crime was adopted in this State in 1841. The duty of preparing a Code adapted to that system was cast on the then judges of this, the Supreme Court. That Code became the law, January 9, 1841. In that Code, a system was prescribed for selecting from the body of the county a list of persons to compose grand and petit juries, and the officers were named whose duty it was to make the selection. With a single exception, the regulations therein prescribed have not been changed, and are still the law. That exception is, that when the persons of African blood were enfranchised under the amendments to the Constitution of the United States, they were tacitly considered as persons entitled to consideration in selecting the jury list. We say tacitly, for there had been no word in our statutes on the subject, which expressed their exclusion. They were excluded, because they were not recognized as citizens, and only citizens could serve on juries. As soon as they were made citizens, their right to serve on juries followed as a corollary. Our statutes on the subject of selecting the persons to serve on juries, the officers by whom the selection is to be made, and the qualifications of jurors, are found in Clay's Digest, 450, §§ 1, 2, 3 ; Code of 1852, §§ 3436 *et seq.;* Code of 1867, §§ 4062 *et seq.;* Code of 1876, §§ 4732 *et seq.* The language of the statute is : " It is the duty of the sheriff of each county to obtain biennially a list of all the householders and

[Green v. The State.]

freeholders residing in his county; from which list must be selected, as hereinafter provided, the names of such persons as may be thought competent to discharge the duties of grand and petit jurors for the county.

"The sheriff, judge of probate and clerk of the circuit or city court, or any two of them, must meet biennially on the first Monday in May, or within thirty days thereafter, at the office of the clerk of the circuit or city court, and select from said list the names of such persons as, in their opinion, are competent to discharge the duties of grand and petit jurors with honesty, impartiality and intelligence, and are esteemed in the community for their integrity, fair character and sound judgment; but no person must be selected who is under twenty-one years of age, or over sixty years of age, or who is a habitual drunkard, or who is afflicted with a permanent disease." Other clauses of the statute make careful provision for the drawing, from this list, of the jurors required at each term of the court.

It will be observed that the statute copied above fixes a high standard of qualifications for jurors, grand and petit. They must be selected by certain officers of the county, who are supposed to be, and usually are men of intelligence and good character, and who, being sworn officers, are bound by their official oaths to discharge this duty honestly and impartially. They must be governed by their opinion and judgment; and are equally bound by their oaths to reject persons who, in their opinion, do not possess the requisite qualifications, as to select those who come up to the standard. The qualifications we have said are high. To authorize selection, the person must be a householder or freeholder in the county, and, in the opinion of the officers performing the service, must be competent to discharge the duties of grand and petit jurors with honesty, impartiality and intelligence, and must be esteemed in the community for his integrity, fair character and sound judgment. These are strong words, and, collectively, constitute an enviable character. In the administration of the law, many householders and freeholders must fall below the standard. But the argument is stronger than this. The matter of selection or rejection is left to the opinion (judgment) of the officers charged with the duty. Who is to review this, or pronounce on their motives? If their opinion or judgment is to control them, how can their conduct, in the absence of abuse of their discretion, and fraud, become the subject of review?

We have another statutory provision in regard to the qualifications of jurors, and how objections to the grand jury are to be raised, which has also existed without material change ever since 1841. It is, that "no objection can be taken to an in-

dictment, by plea in abatement or otherwise, on the ground that any member of the grand jury was not legally qualified, or that the grand jurors were not legally drawn or summoned, or on any other ground going to the formation of the grand jury, except that the jurors were not drawn in the presence of the officers designated by law."—Code of 1876, § 4889. In *State v. Brooks*, 9 Ala. 9, that section was construed in 1846. That construction has been ever since followed.—*Cross v. State*, 63 Ala. 40. Under all our rulings since 1841, if the jurors were drawn before the proper officers, neither this court nor any other court in the State has had or exercised any authority or revising power over the qualifications of grand jurors by whom an indictment was found. This, of course, relates to the power of the court, after the grand jury has been organized. While organizing the jury, it is within the power, and made the duty of the court, to inquire into and ascertain the qualifications of the several persons drawn and summoned for the service; not those qualifications which are left to the judgment or opinion of the officers making the selected list; but other qualifications the statute enjoins, not necessary to be here enumerated. Fraud or partiality in the selection would present a different question.

We may add that, since the enfranchisement of persons of African descent, our statutes have made no distinction in the qualifications of jurors on account of race, color or previous condition of servitude. If officers, charged with the selection of the jury list, or with the drawing of jurors, have made such discrimination on that account, they have done it alike in violation of the law and of their oaths. And, we may add, if those officers select and place on the jury list persons, no matter what their color, who, in their opinion or judgment, do not possess the qualifications prescribed by our statutes, they equally violate the law and their official oaths. But, as we have shown, our statutes withhold the power from all courts to revise or reverse their action in the performance of this service. We were, from the nature of the duty, as powerless to redress the abuse, if abuse there was, as we would be to revise the conduct of a grand jury in finding or not finding a true bill.

It will be seen in what we have shown above, that under our statutes we were forbidden to inquire in any collateral proceeding, whether or not the officers charged with the duty have judiciously selected from the body of the freeholders and householders of the county a jury list of persons possessing the requisite qualifications. That power was *ex industria* taken away from the judiciary of this State more than forty years ago. The policy of the statute was, that grand and petit jurors in this State should be a selected class, not an indifferently sum-

[McLeod v. McLeod.]

moned number from the whole body of electors. A discretion thus confided by legislative authority to officers of the State or county, to be exercised according to their opinion or judgment, can not, on principle, become a judicial question. If there was abuse, it would seem the redress was intended to be left to the removal of the faithless officers, or in legislative change. We confess ourselves unacquainted with any principle, which would, in the absence of proof of official corruption, partiali y, or dereliction, authorize us to revise or reverse the judgment or opinion of the officers clothed with the trust, as to who of the male inhabitants of the county did or did not possess the requisite qualifications, to authorize the placing of their names on the jury list.

The judgment of the circuit court is affirmed.