George GILBERT and Jess Brown,
Appellants,

v.

UNITED STATES of America,
Appellee.

No. 17244.

United States Court of Appeals
Ninth Circuit.

Aug. 8, 1962.

H. Stanton Orser, San Francisco, Cal.,
for appellant.

Cecil F. Poole, U. S. Atty., William J.
Cooney, Asst. U. S. Atty., San Francisco,
Cal., for appellee.

Before HAMLIN and DUNIWAY,
Circuit Judges, and ROSS, District
Judge.

HAMLIN, Circuit Judge.

After a jury trial in the United States District Court for the Northern District of California, Southern Division, George Gilbert, Jr., and Jess Brown, appellants herein, were convicted of aggravated mail robbery and possession of stolen mail under 18 U.S.C.A. §§ 2114 and 1708, respectively. They were each sentenced to a mandatory 25 years imprisonment for the aggravated mail robbery and 5 years for possession of stolen mail, the sentences to run concurrently. They filed a timely appeal to this court which has jurisdiction under 28 U.S.C.A. § 1291.

On brief appellants make three specifications of errors: (1) The court erred in its instruction to the jury with respect to the crime proscribed by 18 U.S.C.A. § 2114 (aggravated mail robbery); (2) the arrest of appellants was unlawful, the search of the dwellings of each appellant was unlawful, and therefore the fruits of such search were improperly received into evidence; and (3) the evidence was insufficient to justify the conviction.

The facts taken in the light most favorable to the government are summarized below. On November 1, 1960, the Federal Reserve Bank of San Francisco prepared six registered parcels containing currency and coin to be sent to the Bank of America N.T. & S.A., Half Moon Bay, California. These six pouches were dispatched with other mail from the United States Post Office, Rincon Annex, San Francisco, at about 5 a. m. on November 2, 1960, for transportation by the San Francisco-Santa Cruz Star Route Trip No. 1. The mail truck driver was Floyd Bateman. En route to Half Moon Bay Bateman stopped at the post office in Moss Beach, California, at approximately 6:30 a. m. After parking his truck in front of the post office he took four pouches of first class mail from the truck for delivery to the Moss Beach post office. As he unlocked the door to the post office two men rushed at him with drawn pistols and one said, "Get back in there. We want the dope on this stuff." Bateman instinctively turned around and swung, hitting one man on the side of his neck. One of the men stated, "We ought to kill the son-of-a-bitch." Bateman dropped the mail pouches and put up his hands. One of the men said to Bateman, "We don't want to hurt you. There is no sense in your getting killed over something that doesn't belong to you." They then forced Bateman to go to a corner of the post office and lie down, whereupon they proceeded to tie his hands and legs and put a mail sack over his head. Both men were wearing masks, hats and white gloves. One of them had on a dove-colored raincoat. The other was wearing a brown sport coat. A government witness, Mrs. Crowley, stated that she could see the Moss Beach post office from the front window of her house, and that a little after 6:30 on the morning in question she noticed a car at the post office with a dark body and a light top. She also saw two people get into the car, one dressed in light clothing and the other in darker clothing. One of the men had on white gloves.

On November 3, 1960, an inspector Birdsall of the San Francisco Police Department received information from a reliable informant that the participants in the mail truck robbery were Brown and Gilbert.[1] Photographs of them were obtained. Information was received that Brown was living at 915 Fulton Street, San Francisco, with another person. The police were also informed that Brown had given his parole officer a different address and that his parole officer had been looking for him. The officers went to the vi-

---

[1]. Birdsall also testified that in April, 1960, he had received information from another reliable informant that the same mail truck was to be held up and that Gilbert was to take part in the robbery. On November 3, 1960, the names of Gilbert and Brown were given to Birdsall as those who actually participated in the robbery on November 2 and he was told the robbery had been planned by a Jimmy White.

Birdsall testified that he knew the informant and had previously obtained reliable information from him.

cinity of the Fulton Street address and found parked on that block a Cadillac automobile with a dark lower portion and a light top. It was learned that this automobile was registered to Jess Brown at 915 Fulton Street, San Francisco. They were informed that the owner of the premises, one Peggy Armstrong, would be home at 8 o'clock in the evening. The officers returned about that time, talked to Peggy Armstrong, and asked her if there was a person residing there by the name of Jess Brown. She replied, "Yes, in Apartment 4." Peggy Armstrong said that she was in charge of the premises and that the people residing there were friends and relatives. When asked whether it was possible for the officers to go to Apartment 4, she replied, "Yes, by all means; I will go up there and let you in." She told the officers that Gilbert and Brown were in the room at that time. They went to Apartment 4 with Peggy Armstrong who placed a key in the lock and called, "Jess". At the same moment the door opened and Brown was standing by the side of the door when the officers entered. They also saw George Gilbert, and both men were placed under arrest.

A search was made of Brown's apartment and a cardboard box was found in a dresser drawer which contained a large number of quarters and dimes. In a white cloth under a rug a package was found which contained a large number of $20, $10 and $5 bills. Brown and Gilbert denied any knowledge of the ownership of this money, as did Peggy Armstrong. The total amount of money obtained from the Fulton Street premises was $8,919.03. Brown later changed his story to say that an acquaintance known to him only as "Bob" brought the currency to the apartment and asked Brown to keep it for him, stating that he would return for the money on the following Saturday. Brown further said that he and Peggy Armstrong had helped to wrap and hide the currency. He later made another change in his story concerning

this money. Also found in Brown's apartment was a dove-colored raincoat similar to the one worn by one of the men who robbed the post office.

Brown told conflicting stories in explanation of Gilbert's presence in the apartment and of when he had recently seen Gilbert.[2] Moreover, Gilbert's story as to his presence in Brown's apartment was at variance with Brown's statement.

Gilbert said that he had no money at his residence, and he gave the officers permission to search the premises. The officers went to Gilbert's home and received permission from Mrs. Gilbert to look for the money that was stolen from the mail truck. A small amount of money was found under the washing machine, and over $9,000 in currency was discovered in the meat freezer compartment of the refrigerator. Mrs. Gilbert denied having any knowledge of this money. Later she testified that a large portion of the money was her savings. Gilbert testified that the money found in his home was the proceeds from gambling. He also testified that he had been unemployed for more than a year prior to the robbery, and he admitted having had a prior conviction for burglary.

At the trial Bateman definitely identified Gilbert as being one of the two men who robbed him, and he stated that Brown "looks like the other man."

It was shown at the trial that the total money lost in the robbery included $12,000 in $20 bills, $7,000 in $10 bills, and $4,000 in $5 bills. In addition there was $1,050 in coin—$500 in quarters, $500 in dimes, and $50 in pennies. The money recovered from Brown's apartment and from Gilbert's residence included $9,740 in $20 bills, $5,450 in $10 bills and $2,815 in $5 bills, as well as $196.75 in quarters, $163.60 in dimes and $8.68 in pennies. The currency recovered from each residence included some new bills in unbroken serial number sequence.

■ From the above brief summary of the evidence it is clear that there

2. During his testimony at the trial Brown admitted having had two prior felony convictions, one of them for armed robbery.

# 325

was more than ample evidence to justify the conviction of each of the appellants and that there is no merit to appellants' Specification of Error number 3.[3]

■ Concerning Specification of Error number 2 that the arrest of appellants was unlawful, that the search of the dwellings of each of the appellants was unlawful, and that the fruits of such search were improperly received in evidence, it is likewise apparent that this Specification of Error lacks merit. The evidence of the information received by the police prior to the time they went to Brown's apartment (most of which was received in the absence of the jury) clearly shows that the officers had probable cause to make the arrest of Brown and Gilbert at Brown's apartment. In ruling at the time of the trial upon appellants' contention that there was no reasonable or probable cause for the making of the arrest, the district judge, after reviewing all of the information that the officers had prior to the arrest, stated that "any officer who failed to make an arrest after the earliest opportunity would be subject to rather substantial criticism as having been fairly derelict in his duty." We agree.

If the officers had probable cause to arrest Brown and Gilbert, there of course can be no merit to a contention that the search of Brown's apartment was unlawful. It was a search made incident to a valid arrest and was therefore proper, and the fruits of the search were properly admitted into evidence.[4]

■ No pre-trial motion to suppress any evidence was made by appellants pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. The motion to suppress is to be made prior to trial, but in the absence of a pre-trial motion the district court in its discretion may entertain an objection to the evidence at trial. Objection was made at trial to the introduction of evidence seized from Gilbert and Brown when arrested and from Brown's apartment when searched incident to the arrest. However, the record does not show that objection was made to the introduction of evidence taken from Gilbert's residence. Failure to make objection to evidence either before or at trial precludes consideration of objections thereto on appeal unless good cause for such failure is shown. This court can in its own discretion notice plain errors on its own motion.[5] There is no plain error in this case, and no cause is shown why objection was not made below. However, appellants' counsel at one point during the trial seemingly indicated a desire to object to the evidence obtained from Gilbert's residence.[6] Furthermore, counsel asked certain questions of government witnesses which appeared to be foundation material for objections to such evidence. For these reasons we feel compelled to point out that the officers involved in this case testified that Gilbert and Mrs. Gilbert gave them permission to search their residence. A person can consent to a search without a warrant and thereby waive the protection of the

3. No motion was made in the district court for a judgment of acquittal either at the conclusion of the government case or at the conclusion of the entire testimony.

4. E. g., Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Rodgers v. United States, 267 F.2d 79 (9th Cir. 1959).

5. Federal Rules of Criminal Procedure 52 (b) provides:
   "Plain errors or defects affecting substantial rights may be noticed although

they were not brought to the attention of the court."

6. Counsel for appellants was requested to stipulate with respect to the chain of custody, etc., of currency being admitted into evidence. At one point he stipulated concerning evidence obtained at 915 Fulton Street (Brown's apartment), and he stated, "I still have a motion on the other currency." Presumably "motion" referred to an objection and "other currency" referred to that obtained at Gilbert's residence. No such motion was ever made, however.

Fourth Amendment against unreasonable searches and seizures.[7]

Finally, we turn to appellants' Specification of Error number 1, namely, that the court erred in its instruction to the jury with respect to the crime proscribed by 18 U.S.C.A. § 2114. The instruction as given is set forth in the margin.[8]

Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., provides in part:

> "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Counsel for appellants in the instant case did not submit or request any instructions. After the court gave its instructions counsel was asked whether he had any exceptions to the instructions as given, and he replied "No exceptions to the instructions as given, your Honor."

In Herzog v. United States, 235 F.2d 664, 667 (9th Cir. 1956), this court stated:

> "In the great bulk of the cases in which counsel have sought to have us consider claims of error in instructions not objected to at the trial we

have declined to do so. More than once we have stressed the salutary nature of Rule 30 and the vitally important part it plays in the administration of justice."

While Rule 52(b) permits appellate courts to recognize plain errors to which no objection was made below,[9] application of the rule is a matter within the sound discretion of the court. In Billeci v. United States, 290 F.2d 628, 629 (9th Cir. 1961), we quoted with approval from Smith v. United States, 173 F.2d 181, 184 (9th Cir. 1949), the following:

> "The admitted normal rule is that an appellate court will not consider matters which are alleged as error for the first time on appeal, and this is true of criminal as well as civil cases. However, an exception exists in criminal cases where the alleged error would result in a manifest miscarriage of justice, or would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.' The appellate tribunal will examine the record sufficiently to determine whether such has occurred." [Footnotes omitted.]

Having in mind the provisions of Rule 52(b) and the teachings of the above mentioned cases and others, we have examined the instruction of which appel-

---

7. See cases cited in United States v. Page, 302 F.2d 81, 84 n. 10 (9th Cir. 1962).

8. "This case is brought under Title 18 U.S.C. § 2114 which provides in part: 'Whoever robs any person having lawful charge, control or custody of the mail matter by putting his life in jeopardy by the use of a dangerous weapon shall be punished as provided by law.'

"In order to find the defendants guilty of Count I of the indictment, you must find beyond a reasonable doubt that one Floyd Bateman had lawful charge, control and custody of the mail matter described in the indictment.

"II. The defendants robbed Floyd Bateman of the mail matter.

"III. The defendants put Floyd Bateman's life in jeopardy by the use of dangerous weapons.

"Robbery is defined as 'unlawful taking of property in the possession of another accomplished by force or fear.'

"A dangerous weapon is one that is likely to produce death or great bodily injury.

"To constitute the crime of robbery by putting in jeopardy the life of a person having the custody and control of the mail by the use of dangerous weapons, within the law it is sufficient that if the act created custody; a well-grounded apprehension of danger to his life in case of resistance or refusal to give up the mail. And an office or status jeopardized by means of dangerous weapons in an attempted mail robbery is immaterial so long as he had charge of the mail matter. [sic]"

Appellants contend the above instruction is ambiguous and fails to emphasize and define some essential elements of aggravated robbery.

9. See note 5 supra.

lants complain. We can find no plain error therein affecting the substantial rights of the appellants, nor can we find any error which would result in a manifest miscarriage of justice. We thus adhere to Rule 30 and refuse to delve into the merits of the contentions appellants make with respect to the instruction.[10]

From an examination of the entire record it appears that the appellants were fairly tried and properly convicted of the crimes with which they were charged. Therefore, the judgment is affirmed.

10. Our decision in this case does not result in an approval of the instruction as given by the district court.