176 So.2d 840

**James Milford DUNCAN, Sr.,**

**v.**

**STATE of Alabama.**

**7 Div. 614.**

Supreme Court of Alabama.

June 30, 1965.

146

Richmond M. Flowers, Atty. Gen., and W. Mark Anderson, III, Asst. Atty. Gen., for the State.

Roy D. McCord, Rowan S. Bone and Hugh H. Smith, Gadsden, for appellant.

LAWSON, Justice.

Appellant, James Milford Duncan, Sr., was indicted for murder in the first degree by a grand jury of Etowah County. He was unable to employ counsel, so prior to arraignment the trial court, under the provisions of § 318, Title 15, Code 1940, appointed experienced and able criminal trial lawyers of the Etowah County Bar to represent him.

Before arraignment, Duncan, by motion to quash and by demurrer, questioned the sufficiency of the indictment on various grounds.

Upon arraignment, Duncan pleaded not guilty and not guilty by reason of insanity. The Court-appointed attorneys were present at arraignment. Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114.

The jury found Duncan guilty of murder in the first degree and imposed the death penalty. Judgment and sentence were in accord with the verdict.

The appeal here is under the automatic appeal law applicable to cases where the death sentence is imposed. Act 249, approved June 24, 1943, General Acts 1943, p. 217, carried in the 1955 Cumulative Pocket Part to Vol. Four, 1940 Official Code, and in the 1958 Recompiled Code as Title 15, § 382(1) et seq.

The attorneys who represented Duncan in the trial court were appointed to represent him on this appeal. They have filed a brief on his behalf and argued the case at time of submission.

## INDICTMENT

■ The motion to quash pointed out certain alleged defects in the indictment. It was overruled without error in that the proper mode of reaching defects in an indictment is by demurrer and not by motion to quash. Boulo v. State, 49 Ala. 22; Daniel v. State, 149 Ala. 44, 43 So. 22. Moreover, all of the alleged defects pointed out in the motion to quash are raised in the demurrer.

■ An indictment for murder in compliance with Form 79, § 259, Title 15, Code 1940, is sufficient. Noles v. State, 24 Ala. 672; Aiken v. State, 35 Ala. 399.

■ The indictment against Duncan is in substantial compliance with that form except that it charges, in the alternative, the means by which the offense was committed. As pertinent, the indictment charges that Duncan " * * * unlawfully and with malice aforethought killed Sandy Ann Scott by placing her in a branch or a lake whereby she was drowned. * * * "

In Rogers v. State, 117 Ala. 192, 23 So. 82, we said:

" * * * When the means by which an offense was committed [are] charged in the alternative, each alternative charge must describe the means with the same definiteness or particularity as would have been required had the charge been made separately in a separate count. * * * " (117 Ala. 195, 23 So. 83)

Counsel for appellant insist that the indictment insofar as it charges that Duncan killed Sandy Ann Scott by placing her in a "branch" whereby she was drowned, is insufficient in that the word "branch" could have reference to "a limb, off-shoot, or ramification; any member or part of a body or system; a local operating division of a business house; a line of family descent; a group." But the word "branch" has also been defined as "a small stream; a creek." Danielley v. City of Princeton, 113 W.Va. 252, 167 S.E. 620; Lee v. Grupe (Tex.Civ. App.), 223 S.W.2d 548. In Dardenne Realty Co. v. Abeken (St. Louis Ct. of App., Mo.), 232 Mo.App. 945, 106 S.W.2d 966, it was said: "That is, to constitute a branch or stream there must be something more than a mere surface drainage, swelled by freshets and melting snow, and running occasionally in hollows and ravines, which are generally dry." It is, of course, a matter of common knowledge that the word "branch"

is frequently used to describe a small stream of water and when an indictment charges that a defendant drowned a person by placing him or her in a "branch" it sufficiently advises the accused of the means by which the State claims he killed the deceased. To drown a person is to deprive him of life by immersion in water or other liquid. The indictment here, in effect, charges the defendant with taking the life of Sandy Ann Scott by immersing her in a branch, or stream of water. The word "branch" when considered with the word "drowned" could not relate to any of the definitions which we have quoted above from appellant's brief.

The demurrer to the indictment was properly overruled.

## FACTS

On Saturday, February 23, 1963, Duncan was an employee of Lasseter's Motel, which was located on the Guntersville Highway in Etowah County. He lived in one of the rooms of the motel. His work seems to have been that of a general handy man, cleaning rooms, looking after the premises and performing other menial tasks.

About six o'clock on that evening J. L. Walker, Elbert Ross, Mrs. Margaret Scott and Miss Jackie Dixon began occupancy of a room in the Lasseter Motel which was situated next to that in which Duncan lived. With them was Mrs. Scott's eighteen-month-old baby girl, Sandy Ann Scott. Walker alone registered for the room, but Mrs. Scott claimed to be Walker's wife and Miss Dixon claimed to be the wife of Ross.

At about ten o'clock on the night of September 23, 1963, Ross and the two women left the motel to get some food. When they left, Walker and the baby were asleep in the same bed. Ross and the two women were gone about an hour. When they returned, Walker was still asleep. The baby was not in the room.

Ross and the two women awakened Walker and inquired as to the whereabouts of the baby. Walker replied, "What do you mean." A search for the baby was begun after the motel office was notified that the baby was missing. The owner of the motel got in touch with the "Rescue Squad" and representatives of that organization soon appeared on the scene and began searching operations.

Dewey Colvard, the Sheriff of Etowah County, was notified that the baby was missing and he sent some of his deputies to the motor court and they joined in the search.

Sheriff Colvard reached the scene at about 1:45 A.M. on the morning of the 24th of February, 1963. He joined in the search. Walker, Ross, Mrs. Scott, the baby's mother, and Miss Dixon were carried to the Sheriff's office, where they remained until about 9:00 A.M. on Sunday, the 24th of February.

Sheriff Colvard and one of his deputies entered the room or cabin at the motel where Duncan lived at about 3:00 A.M. on the morning of the 24th of February. The manner in which they gained entrance to Duncan's room does not appear. Duncan was awakened and talked to by the Sheriff and his deputy. The Sheriff and his deputy were looking for the baby. They looked around the room and in the adjoining shower, first using a flashlight and afterwards the overhead light was turned on. The Sheriff saw a lot of clothes on the floor but did not see any baby clothes. He did see a "pair of coveralls—overall pants" on the floor, which he did not examine. After he finished talking with Duncan the Sheriff turned off the lights and he and his deputy left. There is no evidence that the Sheriff or his deputy had a search warrant on that occasion.

Shortly after 6:00 on the morning of Sunday, February 24, 1963, the body of the baby was found face down in a lake not far distant from the motel. Pictures of the baby were taken before she was removed from the lake. These pictures were admitted in evidence.

On his way to a funeral home with the baby's body, Sheriff Colvard called for the assistance of Mr. William T. McVay, a State toxicologist, who arrived in Gadsden within a short time and, after examining the body at the funeral home, determined that death was caused by drowning. Mr. McVay took pictures of the deceased at the funeral home, which were admitted in evidence.

Sheriff Colvard concluded his questioning of Walker, Ross, Mrs. Scott and Miss Dixon at his office around nine or ten o'clock on Sunday morning, February 24th. The record does not indicate that the questioning of those persons revealed any information which tended to connect Duncan with the commission of the crime, yet immediately after the questioning, Sheriff Colvard sent Chief Deputy Reynolds and three other deputies to the motel. On direct examination Sheriff Colvard stated that he sent the deputies to the motel with an order that Duncan be "brought in, picked up." On cross-examination he was asked the following question and gave the following answer:

"Q. Now then, the following morning, I believe that you came back, and you sent your Deputies out to have him arrested—Duncan.

"A. Yes, sir."

Reynolds and the other deputies arrived at Duncan's room about eleven o'clock on the morning of February 24th. Chief Deputy Reynolds was the only witness as to what occurred on that occasion. According to Reynolds, one of the deputies knocked on Duncan's door. Duncan invited them in but the record does not support a finding that before the invitation was extended Duncan was advised that those who wished to enter were police officers. According to Reynolds, the lock on the door "was broken, or didn't work, or something." When the deputies entered the room Duncan was in bed, although apparently awake. The deputies did not have a search warrant and apparently did not have a warrant for Duncan's arrest, as Reynolds testified that Duncan was not arrested on that occasion. Reynolds testified that he "instructed him to get dressed" and also said, "I asked him, when he dressed, to come on, that I wanted him to go down to the Court House, that the Sheriff wanted to talk to him." While Duncan was dressing a search was made of his room and shower. The deputies found a pair of "blue jeans" on the floor near or under Duncan's bed. They were wet for a distance of ten to twelve inches from the bottom of the trouser legs and red mud was on the bottom of the trousers. A large red stain was on or near the fly of the "blue jeans." The officers took the "blue jeans" into their possession and they were admitted in evidence in connection with the testimony of the toxicologist to the effect that the red stain was, in his opinion, caused by human blood of the same type as the deceased's blood. Duncan admitted to the officers that the "blue jeans" were his and that "they were trousers he had used the previous night, in searching for the child, or had been wearing them the previous night." The deputies, while Duncan was present, removed human hairs from a wet towel and from a bed sheet, which hairs were admitted in evidence in connection with the toxicologist's testimony to the effect that the hairs were of the same texture and type as those which he removed from the head of the deceased. The deputies also took into their possession two shaving lotion bottles which were admitted in evidence, and it was shown that Duncan had purchased two bottles of shaving lotion on the afternoon of the crime. Reynolds also testified that the officers took from Duncan's room "some baby clothes, diapers * * *. Four new diapers, one blue—two-tone, blue blouse, one yellow pajama top, one white undershirt, one white pajama bottom." But these items were not admitted in evidence. Reynolds stated that he saw Duncan put on a white shirt which had a discoloring on it which appeared to be blood. After two of the deputies took Duncan to the courthouse, Reynolds continued his search of Duncan's room and re-

moved therefrom a bed sheet upon which was a discoloration which he said appeared to be blood.

Immediately after the last-mentioned search of Duncan's room, he was carried to the courthouse or jail, where he was met by Sheriff Colvard, who testified: "* * * I told the Defendant that this crime had been committed and we was going to have to question him about it. And I asked him to lower his pants." Duncan complied with that request and the Sheriff noticed that the tail of the shirt "appeared to have blood on it." Duncan told the Sheriff he did not know the blood was on the shirt. The shirt was admitted in evidence along with the testimony of the toxicologist to the effect that, in his opinion, the substance on the tail of the shirt was human blood of the same type as that of the deceased baby. It was also of the same type as Duncan's blood, a fact brought out by Duncan's counsel. Duncan was then "confronted" with the "blue jeans" with the stain thereon and said, "I don't know where it could have come from unless it was when I hurt my hand digging a ditch." Duncan denied wearing the "blue jeans" on the previous night, saying that the last time he wore them was when he dug the ditch. Sheriff Colvard examined Duncan on that occasion at length and while Duncan said that he had helped in the search for the child, he stated he did not "know a thing about the child at all."

Late in the afternoon of February 24th, after Duncan had been placed in jail or was being detained in the Sheriff's office, Chief Deputy Reynolds and another deputy entered Duncan's room and made a search without a search warrant, but with permission of the motel owner. Reynolds testified that during that search he found a diaper pin under Duncan's bed, which he took into his possession. The pin was not introduced in evidence.

There is an endorsement on the "Writ of Arrest on Indictment" which was executed on March 13, 1963, the day on which the indictment was returned, indicating that Duncan was confined in jail on February 24, 1963. Sheriff Colvard testified that Duncan was not "charged" until Monday, February 25th. Duncan remained in custody from February 24th until the date of trial.

On Tuesday, February 26th, Duncan was carried to the "photography department," where he was asked to disrobe. He complied with that request and twenty-four "close-up" color slides or pictures were taken of his entire body, including his hands. The slides or pictures of his hands were admitted in evidence. The others were not introduced. At the time these slides or pictures were made, no member of his family had requested to visit him. No lawyer was present and Duncan had not been advised that he had a right to consult counsel, but Sheriff Colvard testified that Duncan consented to having the pictures made.

On the next day, Wednesday, February 27th, Duncan was questioned by Sheriff Colvard, by the circuit solicitor, and by two of the latter's deputies or assistants before a court reporter. Duncan's sworn statement made on that occasion was introduced in evidence by his counsel. In that statement Duncan gave a detailed account of his movements on Saturday and Saturday night, February 23rd, the day of the crime. Duncan said that he never saw the child and did not even know it was in the room next to the one which he occupied. He stated that he had been drinking whiskey and wine that day and that he did not remember anything that occurred after he returned from a visit with his ex-wife to the motel late Saturday afternoon until he was awakened about eleven o'clock by someone who told him a baby had been lost. Duncan admitted buying shaving lotion on Saturday but did not remember drinking it. Duncan said it was agreeable with him for his questioners to arrange to have a lie detector test made of him.

Other than testimony to the effect that Sheriff Colvard and perhaps his deputies

talked to Duncan each day for a short period of time, the record is silent as to anything that transpired during the time Duncan was confined in his "private" jail cell from Wednesday, February 24th, until March 6th.

On the date last mentioned, Sheriff Colvard and Chief Deputy Reynolds brought Duncan from Gadsden to Montgomery. The trip was made without a court order. Sheriff Colvard testified, "We carried him at his request." They reached Montgomery around ten-thirty or eleven o'clock and Duncan was carried to the City of Montgomery jail by Deputy Reynolds. Sheriff Colvard called on officials of the Montgomery Police Department soon after his arrival in Montgomery. At about one o'clock on March 6th, Duncan was brought from the Montgomery City Jail to the Montgomery Police Department, where he was taken to the polygraph room of that department. He was seated in a comfortable lounge chair in that room, in which the only other equipment was a desk, on which the polygraph equipment had been placed, and a chair behind the desk for use by an examiner. While Duncan was so seated, Lieutenant Wright, of the Montgomery Police Department, a polygraph examiner, entered the room and introduced himself to Duncan. He told Duncan that there was a two-way mirror in the room, but he did not tell him that the effect of that mirror was to permit people from the outside to see and observe what was going on in the polygraph room without themselves being seen. He did not tell Duncan that a permanent fixture on the desk was a microphone, which was so installed and connected that the persons viewing the proceedings from the other side of the so-called two-way mirror could also hear what was occurring in the room. He did explain to Duncan that on the desk was situated the polygraph instrument.

Lieutenant Wright told Duncan that he did not have to submit to the examination; that he should do so only from his own free will and accord. He showed Duncan a "release" which apparently his department required all subjects to sign either before being interrogated or subjected to the lie detector test. Wright asked Duncan to read the release. Duncan stated that he could not read, whereupon Wright read the release to Duncan, who then signed it. Wright did not tell Duncan that a lie detector test was not legal evidence and could not be used against him in court.

Lieutenant Wright asked Duncan if he knew why he was in Montgomery and he stated he knew he was there because of the little girl who had been killed and said that he didn't know anything about it other than what he had already told Sheriff Colvard. After talking with Wright for some twenty to twenty-five minutes Duncan, according to Wright, then stated that he had confidence in Wright; that he had not told Sheriff Colvard the truth, but that he was now ready to tell the truth to Wright. According to Wright, the defendant, Duncan, then made the following statement:

"He stated that he was in the room next door to where the baby was on the night of the incident, and he had heard a party going on in that room, in the next room from his room, apparently men and women both in the room.

"Later he heard a baby crying, and he walked out of his cabin, next door to the cabin where the baby was crying, and said that he found the door ajar. He pushed the door open, and the baby was in the floor. He picked the baby up and walked back over to his cabin and went in.

"He said he laid the baby on the bed and—he thought his intentions were to change the baby's diaper. And from there he said he didn't know what happened but, after he got the baby's diaper off, he pulled his pants off and got in the bed with the baby and tried to rape the baby. He wasn't successful in doing that, so he inserted his

finger in the baby's vagina. The baby began to scream, and he said he became excited and he snatched the baby up and took it in his arms, holding his left hand over the baby's mouth, gathered up what clothes he could and went out around behind the cabin.

"After going behind the cabin, he said he continued down through this marsh area, is the way he described it to me, to a branch, and as he was attempting to cross the branch he slipped, and dropped the baby into the branch.

"He stated the baby must have floated fifteen or twenty feet in this branch before he could recover it.

"After he recovered the baby from the branch, he stated that he went up this branch to a lake. He described the place where he dropped the baby, and said that he did throw the baby into the lake. In the area where he threw the baby, he described as being an old house. And, more specifically, there was a big oak tree right on the edge of the lake.

"After he threw the baby in the lake, he said he came back down the branch and up behind the cabin, went into his room and got in bed.

"And later, he said, that some people came to his apartment, or to his cabin, wanting to know if he had heard the baby or seen the baby, or anything."

After Duncan had concluded making the statement set out above, he was asked by Wright if he would mind repeating the statement in the presence of Sheriff Colvard, who had been viewing the proceeding through the two-way mirror and listening to them by means of the microphone which was affixed to the desk. Duncan indicated that he would not mind repeating the statement to Sheriff Colvard. Wright then brought Sheriff Colvard into the polygraph room and, according to the Sheriff, Duncan then made a statement to him which the Sheriff summarized in the following language:

"He told me that he went into the room and got the baby and taken [sic] into his room. The baby was crying. He said he went into his room with it, and he got into bed with the baby, and he didn't know what happened, but then that he got out of the bed with the baby and carried it and dropped it in a branch. Picked it up out of the branch and carried it and threw it in the lake."

On cross-examination of the State's witness Wright, counsel for Duncan brought out the fact that after Duncan made his oral statements to Wright and to Sheriff Colvard, wherein he related his connection with the child's death, Wright then gave Duncan "a Polygraph test." According to Wright, Duncan took the test voluntarily. Wright said that after examining the test, it was his opinion that Duncan told substantially the truth when he said "that he slipped and fell and dropped that child in the water" and that Duncan told the truth when he said "that he attempted to get the child out of the branch, following it some 15 or 20 feet down the branch before he succeeded." The defendant having injected into the case the fact that the polygraph test was made, and having questioned Wright as to his opinion as to the truthfulness of some of the statements made by Duncan on the test, the trial court permitted the State to elicit from Wright evidence to the effect that Duncan gave truthful answers to the other questions propounded to him on the test, which answers definitely connected Duncan with the child's death.

Following the occurrences in the polygraph room, Duncan was carried to an adjoining room where there was a typewriter. He had agreed to sign a written statement. Sheriff Colvard questioned Duncan in the presence of a detective of the Montgomery Police Department and others. The detective typed the questions as they were propounded by Sheriff Col-

vard and the answers as they were given by Duncan. Sheriff Colvard conceded that the questions which he propounded were leading in their nature. After this interrogation was completed, the questions and answers were read over to Duncan, who said that the answers which he had given were correct, and he then signed the statement or confession in the presence of persons who witnessed his signature. The written statement is substantially the same as the oral statement given by Duncan to Lieutenant Wright.

On the following day, March 7, 1963, after Duncan had been carried back to Gadsden, the county seat of Etowah County, he was again interrogated by Sheriff Colvard in the presence of a court reporter, who took down Sheriff Colvard's questions and Duncan's answers. When this questioning was completed and the questions and answers were typed up, Duncan signed the statement, which contains some details different from those contained in some of his previous statements, but we do not think they are of sufficient importance to point out here.

Duncan did not testify. Only two persons were called as witnesses in his behalf. They were the owner of the motel and her husband, both of whom gave testimony to the effect that on Saturday afternoon, February 23, 1963, Duncan was drinking excessively. They further testified that for a period of months, following a railroad accident, Duncan had suffered "blackout spells," during which he was capable of moving and acting, but would remember nothing that transpired during the "spells." They testified that such condition was worse when Duncan was drinking. The owner of the motel also gave testimony to the effect that on the day of the crime, Saturday, February 23, 1963, she observed blood on one of Duncan's hands. This testimony was no doubt offered to explain the presence of blood on the "blue jeans" and on Duncan's shirt.

SEARCH AND SEIZURE—Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933

One of the serious questions presented is whether the trial court erred to reversal in permitting the State to offer evidence relative to the articles which the investigating officers found in Duncan's room, which had a tendency to connect Duncan with the commission of the crime with which he was charged.

Prior to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933, decided by the Supreme Court of the United States on June 19, 1961, the appellate courts of this state had consistently held that evidence obtained by an unreasonable search and seizure was admissible in the trial of one charged with a violation of the law of this state, except where evidence so obtained was made inadmissible by a state statute, such as § 210, Title 29, Code 1940. Fikes v. State, 263 Ala. 89, 81 So.2d 303; Oldham v. State, 259 Ala. 507, 67 So.2d 55; Ingram v. State, 252 Ala. 497, 42 So.2d 36; Banks v. State, 207 Ala. 179, 93 So. 293, 24 A.L.R. 1359; Shields v. State, 104 Ala. 35, 16 So. 85. Our holdings in the cases just cited were in accord with the rule enunciated by the Supreme Court of the United States in Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, decided in 1949, to the effect that evidence secured in violation of the Fourth Amendment to the Constitution of the United States, if relevant, was admissible in a State court; that the provisions of the Fourth Amendment were not imposed on the States by the Fourteenth Amendment.

But Mapp, supra, overruled Wolf v. People of State of Colorado, supra, in the respect indicated and held that "all evidence obtained by searches and seizures in violation of the Constitution is, by the same authority, inadmissible in a state court." Thus, the federal exclusionary rule as promulgated in Weeks v. United States,

232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, was made applicable in the courts of those states, including Alabama, which had not previously adopted the exclusionary rule.

It appears that this court has not been called upon to consider the federal exclusionary rule in a criminal case appealed directly to this court since the Mapp case, supra, was decided. However, in Carlisle v. State ex rel. Trammell, 276 Ala. 436, 163 So.2d 596, a proceeding in equity to abate an alleged gambling nuisance, after citing Mapp, we said:

> "Applying the rule that evidence obtained by an illegal search is not competent or legal in a proceeding against the party whose person or property was subjected to the illegal search, which produced the evidence, we will not consider the testimony of the officers or other persons who participated in the search, or raid, which was made without a warrant." (276 Ala. 438, 163 So.2d 598)

The Court of Appeals of Alabama has recognized the impact of the holding in the Mapp case upon criminal prosecutions in a number of cases, including Smith v. State, 41 Ala.App. 528, 138 So.2d 474; Moore v. State, 41 Ala.App. 657, 146 So.2d 734; Phillips, alias Moore v. State, 42 Ala.App. 64, 152 So.2d 148, cert. denied, 275 Ala. 698, 152 So.2d 150; Lawson v. State, 42 Ala. App. 172, 157 So.2d 226, cert. denied, 275 Ala. 695, 157 So.2d 228; Pate v. State, 42 Ala.App. 350, 165 So.2d 127, cert. denied, 276 Ala. 706, 165 So.2d 128; Matthews v. State, 42 Ala.App. 406, 166 So.2d 883; Brown v. State, 42 Ala.App. 429, 167 So.2d 281, cert. denied, 277 Ala. 108, 167 So.2d 291; York v. State (Ala.App.), —— So.2d ——; Knox v. State, 42 Ala.App. 578, 172 So.2d 787, cert. denied, 277 Ala. 699, 172 So.2d 795; Sopcjak v. State, 42 Ala.App. 608, 173 So.2d 403; Ramsey v. City of Huntsville, 42 Ala.App. 603, 172 So.2d 812; Carpenter v. State, 42 Ala.App. 618, 174 So.2d 336; McCurdy v. State (Ala. App.), 176 So.2d 53, cert. denied (Ala.), 176 So.2d 57.

In several of the cases just cited, the Court of Appeals indicated that a pre-trial motion to exclude evidence obtained by an unreasonable search and seizure is necessary. But in denying certiorari in Brown v. State, supra, this court said: "We do not hold that a pretrial motion to suppress is improper, but do hold that such motion is not necessary and that objection may be made for the first time when the illegally obtained evidence is offered at the trial." (167 So.2d 294)

Perhaps it is well to note that in reviewing a death case under the automatic appeal statute, supra, we may consider any testimony that was seriously prejudicial to the rights of the appellant and may reverse thereon, even though no lawful objection or exception was made thereto. Alberson v. State, 254 Ala. 87, 47 So.2d 182. Our review is not limited to the matters brought to our attention in brief of counsel. Lee v. State, 265 Ala. 623, 93 So.2d 757.

The holding of the Supreme Court of the United States in the Mapp case, supra, may not nationalize the law of search and seizure, but it does compel state courts to examine and resolve the problems arising from the search for and seizure of evidence in the light of the federal Constitutional guarantees against unlawful search and seizure.

The Fourth Amendment to the Constitution of the United States " * * * forbids every search that is unreasonable; it protects all, those suspected or known to be offenders as well as the innocent, and unquestionably extends to the premises where the search was made * * *." Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374. In the case just cited it was observed that there is no formula for determination of reasonableness. Each case is to be decided on its own facts and circumstances.

When police officers want to search a person's home they must have either a

search warrant or a knowing, voluntary permission, unless the search is incidental to a lawful arrest or there are other cir-: cumstances, not present in this case, which justify a departure from the rule. Waldron v. United States, 95 U.S.App.D.C. 66, 219 F.2d 37. See United States of America v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59.

With the foregoing in mind, we come to a consideration of the conduct of the officers in this case in obtaining the articles from Duncan's room which unquestionably tended to connect him with the commission of the crime, in order to determine whether those articles were obtained in violation of the Fourth Amendment.

■ It is well established that a person's hotel room is protected against unreasonable search and against seizure of articles therein. United States v. Jeffers, supra; Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; Hall v. Warden, 4 Cir., 313 F.2d 483; United States ex rel. Clark v. Maroney, 3 Cir., 339 F.2d 710. Moreover, the record in this case shows beyond peradventure that the motel room which the officers entered and from which they obtained the incriminating evidence was considered by Duncan and others as constituting his home.

It is conceded that the officers did not have a search warrant on any occasion when Duncan's room was entered, searched and the incriminating articles taken therefrom.

The search of Duncan's room by Sheriff Colvard around three o'clock on the morning of February 24, 1963, produced no damaging testimony, in our opinion. On that occasion Sheriff Colvard was looking for the little girl. He did not testify that he found any incriminating evidence whatsoever or that he saw anything which indicated that Duncan was the perpetrator of the crime.

Incriminating evidence was obtained in the search made by Chief Deputy Reynolds and other deputies around eleven o'clock on the morning of February 24th. Does the evidence show that a "knowing, voluntary permission" was given by Duncan for that search to be made?

When the State sought to introduce some of the evidence obtained during that search, counsel for the defendant objected on the ground, among others, that such evidence was the result of an illegal search and seizure. At this point the following transpired:

"The Court: Mr. Reynolds, did the defendant, at the time you went into his room, say anything to you with reference to whether you were to come in or not, did he tell you not to come in, or to come in?

"The Witness: Yes, sir. He invited us in."

■ A person can consent to search without warrant and thereby waive the protection of the Fourth Amendment against invasion of the right of privacy. Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477; Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668; Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Gilbert v. United States, 9 Cir., 307 F.2d 322, cert. denied, 372 U.S. 969, 83 S.Ct. 1095, 10 L.Ed.2d 132; United States v. Page, 9 Cir., 302 F.2d 81, and cases cited.

■ But courts indulge every reasonable presumption against waiver of fundamental constitutional rights. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Knox v. State, 42 Ala.App. 578, 172 So.2d 787, cert. denied, 277 Ala. 699, 172 So.2d 795.

In United States v. Page, supra, it was said:

"Because of the importance of preserving constitutional rights, various rules have been stated for the guidance of the trial judge in determining whether consent to the search was in

fact given. The government must prove that consent was given. It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given'. There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. * * *"

See Gibson v. United States, 80 U.S.App. D.C. 81, 149 F.2d 381, cert. denied, O'Kelley v. United States, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429; United States v. Viale, 2 Cir., 312 F.2d 595, cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199; United States v. Smith, 2 Cir., 308 F.2d 657, cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed. 2d 716; Nelson v. United States, 208 F.2d 505; Judd v. United States, 89 U.S.App. D.C. 64, 93 U.S.App.D.C. 14, 190 F.2d 649; Nueslein v. District of Columbia, 73 App. D.C. 85, 115 F.2d 690; Channel v. United States, 9 Cir., 285 F.2d 217; Waldron v. United States, 95 U.S.App.D.C. 66, 219 F.2d 37.

It is said in some cases, among them United States v. Smith, 2 Cir., 308 F.2d 657, as follows: "When a law enforcement officer knocks at the door, identifies himself, and asks to be allowed to search the premises, the acquiescence thus obtained is generally not considered to be voluntary consent."

In this case the law enforcement officers did not identify themselves and did not ask to be allowed to search the premises. After gaining admittance without identifying themselves, the officers searched Duncan's room and removed the articles in issue without requesting Duncan's permission.

 We are clear to the conclusion that the invitation to enter his room, extended by Duncan to the person who knocked on his door, did not constitute a consent to the search of his room so as to constitute a waiver of his right to complain that the search and resulting seizure were committed in violation of the Fourth Amendment

to the Constitution of the United States. Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Higgins v. United States, 93 U.S.App. D.C. 340, 209 F.2d 819; Lee v. United States, 98 U.S.App.D.C. 97, 232 F.2d 354.

In Knox v. State, supra, the Court of Appeals of this state said:

"* * * To justify the introduction of evidence seized by a police officer within a private residence on the ground that the officer's entry was made by invitation, permission, or consent, there must be evidence of a statement or some overt act by the occupant of such residence sufficient to indicate his intent to waive his rights to the security and privacy of his home and freedom from unwarranted intrusions therein. An open door is not a waiver of such rights. A peaceful submission to a search or seizure is not a consent or an invitation thereto, but is merely a demonstration of regard for the supremacy of the law. * * *" (172 So.2d 791)

 Were the search which the Sheriff's deputies made of Duncan's room and the objects removed therefrom around eleven o'clock on the morning of February 24, 1963, incident to a lawful arrest?

We think not. True, Sheriff Colvard testified that he sent the deputies to Duncan's room on that occasion to arrest him and it is also established that after a search was made of his living quarters Duncan was carried to the courthouse. It has never been contended that the deputies had a warrant for Duncan's arrest and Chief Deputy Reynolds testified that no arrest was made and that Duncan accompanied two of the deputies to the courthouse after Reynolds had "instructed him to get dressed" and then asked him "when he dressed, to come on, that I wanted him to go down to the Court House, that the Sheriff wanted to talk to him." Reynolds did not even tell Duncan what the Sheriff wanted to talk

to him about and, since Duncan was not at the time engaged in the actual commission of a public offense, nor was he on pursuit, such information should have been conveyed to Duncan in order to constitute the act of the deputies in carrying Duncan to the courthouse a lawful arrest. § 155, Title 15, Code 1940. See Ezzell v. State, 13 Ala.App. 156, 68 So. 578; Tarwater v. State, 16 Ala.App. 140, 75 So. 816; Cobb v. State, 19 Ala.App. 345, 97 So. 779; Johnson v. State, 19 Ala.App. 141, 95 So. 583; Brown v. State, 109 Ala. 70, 20 So. 103; Rutledge v. Rowland, 161 Ala. 114, 49 So. 461.

Section 154, Title 15, Code 1940, provides in pertinent parts as follows:

"An officer may also arrest any person, without warant, on any day, and at any time, for any public offense committed, or a breach of the peace threatened in his presence; or when a felony has been committed, though not in his presence, by the person arrested, *or when a felony has been committed, and he has reasonable cause to believe that the person arrested committed it;* * * *." (Emphasis supplied.)

The arrest of Duncan at the time of the search, if he was in fact then arrested, cannot be justified as an "on view" arrest. He committed no public offense nor threatened a breach of the peace in the presence of the deputies. Knox v. State, supra.

Nor could such an arrest be held to be lawful on the ground that the deputies had reasonable cause to believe that Duncan had committed a felony.

In Berry v. State, 27 Ala.App. 507, 175 So. 407, our Court of Appeals cited Suell v. Derricott, 161 Ala. 259, 49 So. 895, 23 L.R.A.,N.S., 996, in support of the following statement:

"Of course, an officer cannot justify an arrest on the ground that he [had] reasonable cause to believe the person arrested had committed a felony, unless he has information of facts derived from credible sources, or from persons reasonably presumed to know them, which, if submitted to the judge or the magistrate having jurisdiction, would require the issue of a warrant of arrest. * * *" (27 Ala.App. 511, 175 So. 409)

In Union Indemnity Co. v. Webster, 218 Ala. 468, 118 So. 794, it was said, in effect, that "reasonable cause to believe," as used in § 154, Title 15, Code 1940, is knowledge of circumstances such as would lead a reasonable man of ordinary caution, acting impartially, reasonably and without prejudice, to believe the person arrested to be guilty. And in Findlay v. Pruitt, 9 Port. 195, we said that mere suspicion will not afford a justification for an arrest. See Gibson v. State, 193 Ala. 12, 69 So. 533.

As far as this record discloses, the deputies, when they entered Duncan's room around eleven o'clock on the morning of February 24, 1963, were possessed of no information or facts which, if submitted to a judge or magistrate, would have required the issuance of a warrant of arrest. Berry v. State, supra. As stated above, Sheriff Colvard's entrance into Duncan's room at three o'clock on the morning of that day, insofar as this record discloses, produced no information tending to connect Duncan with the offense. If the Sheriff or his deputies were even suspicious of Duncan, such suspicion must have been based simply on the fact that he occupied the cabin next to that in which the deceased child had been kept.

There are innumerable federal cases to the effect that police officers may not arrest on mere suspicion, but only on "probable cause." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; United States v. Walker, 7 Cir., 246 F.2d 519; Bucher v. Krause, 7 Cir., 200 F.2d 576, cert. denied, Krause v. Bucher, 345 U.S. 997, 73 S.Ct. 1141, 97 L.Ed. 1404; Worthington v. United States, 6 Cir., 166 F.2d 557; United States v. Castle, D.C., 138 F.Supp. 436.

It is fundamental that an arrest without probable cause cannot be validated by evidence obtained in a subsequent search and likewise that the search cannot be validated by the invalid arrest. Busby v. United States, 9 Cir., 296 F.2d 328.

When a police officer arrests without a warrant, and the defendant objects to the introduction of evidence claimed to be incident to such an arrest, the burden is on the State to show that the arrest was lawful. Knox v. State, supra. Objections were interposed to all evidence relating to the fruits of the search. We do not mean to hold that objections to evidence are required for our review in a capital case.

The State did not meet that burden in this case.

We are constrained to the conclusion that reversible error is made to appear in the trial court's rulings permitting the State to introduce in evidence the "blue jeans" and the strands of hair identified as being similar to the hair of the deceased child, all removed from Duncan's room following the eleven-o'clock search.

Likewise, it was error to permit Chief Deputy Reynolds to testify that on that occasion he saw several items of baby clothing in Duncan's room; that he saw a large red stain on or near the fly of the "blue jeans"; that he saw a spot on Duncan's shirt which appeared to be blood; that he saw a discoloration on a bed sheet which appeared to be blood. The exclusionary rule imposed upon the states by the holding of the Supreme Court of the United States in the Mapp case, supra, applies not only to the introduction into evidence of physical objects illegally taken, but also to the introduction of testimony concerning objects illegally observed. Wong Sun v. United States, supra; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; McGinnis v. United States, 1 Cir., 227 F.2d 598.

The introduction in evidence of the bottles removed from Duncan's room following the eleven-o'clock search would not, in our opinion, require a reversal, as we are unable to see any possible injurious effect to Duncan by such evidence.

We are also of the opinion that the testimony of Chief Deputy Reynolds to the effect that he found a diaper pin in Duncan's room when he searched it late in the afternoon of February 24, 1963, was erroneously admitted. That search, like all the rest, was made without a search warrant. Duncan was at the time being held at the county courthouse. Hence, he could not have invited Reynolds in to make a search and there is nothing to show that he had been approached about the search while in custody. Since Duncan was already in custody, the search could not be said to have been made as incident to a lawful arrest. The only possible justification of the search was Reynold's statement to the effect that he received permission of the owner or operator of the motel to enter Duncan's room. Such permission was not sufficient to make the search a legal one. Stoner v. State of California, supra.

We are unable to determine exactly how and under what circumstances Duncan's shirt, which was introduced in evidence, was obtained. We refrain, therefore, from expressing an opinion in regard to its introduction.

## CONFESSIONS

We come now to a consideration of the admissibility of the confessions of the defendant, Duncan, introduced in evidence by the State.

The rule is that extrajudicial confessions are prima facie involuntary and inadmissible and the duty rests in the first instance on the trial court to determine whether or not a confession is voluntary and unless it so appears it should not be admitted. Myhand v. State, 259 Ala. 415, 66 So.2d 544; Phillips v. State, 248 Ala.

510, 28 So.2d 542; White v. State, 260 Ala. 328, 70 So.2d 624; Hines v. State, 260 Ala. 668, 72 So.2d 296; Goldin v. State, 271 Ala. 678, 127 So.2d 375; Smitherman v. State, 264 Ala. 120, 85 So.2d 427.

During the examination of the witnesses who heard the confessions made, which examination occurred in the presence of the jury, the State introduced evidence tending to show that no threat was made against the accused; that he was not physically mistreated; that he was not told it would be better for him to make a confession or worse for him if he did not; that no reward was offered or held out to him to get him to confess; that no inducement of any kind was made to him. Counsel for Duncan were not denied the right to examine the witnesses who so testified. No evidence being offered by the defendant to the contrary, the confessions were admitted in evidence over the defendant's objections.

As heretofore indicated, the occurrences referred to in the preceding paragraph all occurred in the presence of the jury. There was no request made by counsel for the defendant that the court determine the question as to whether or not the confessions were voluntary outside of the presence of the jury. As to one of the confessions, there was a discussion held outside the presence of the jury, but the testimony and ruling thereon occurred in the jury's presence.

Our Court of Appeals, on May 4, 1965, in the case of Taylor v. State, 42 Ala.App. 634, 174 So.2d 795, which case was not brought here by the State for review, said:

"Before the voluntariness of the confession is determined by the trial court, the court should receive and hear any testimony offered by the accused tending to show that the confession was not made voluntarily. Jackson v. State, 83 Ala. 76, 3 So. 847; White v. State, 260 Ala. 328, 70 So.2d 624, *and the accused should be given the opportunity to present such*

*testimony on voir dire, in the absence of the jury.* See United States v. Carignan, 342 U.S. 36, 38, 72 S.Ct. 97, 96 L.Ed. 48; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; Rudolph v. Holman, D.C., 236 F.Supp. 62.

"Here when appellant's counsel indicated that he had completed the voir dire examination of Sheriff Paul and stated that he had other witnesses on voir dire, the trial judge, by his ruling, to which counsel excepted, precluded any opportunity for appellant to put on other witnesses *in the absence of the jury* for the purpose of showing that his confession was not voluntary. This was error for which the judgment must be reversed and remanded." (Emphasis supplied) (174 So.2d 797)

In Rudolph v. Holman, D.C., 236 F.Supp. 62, cited by our Court of Appeals in Taylor v. State, supra, the petitioner, Rudolph, was awaiting execution in Kilby Prison, following his conviction of the crime of rape, at the time he filed his petition for writ of habeas corpus in the United States District Court, Middle Division of Alabama, Northern District. We had affirmed Rudolph's conviction. Rudolph v. State, 275 Ala. 115, 152 So.2d 662. The Supreme Court of the United States had denied certiorari. Rudolph v. Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119. We had also denied a petition for leave to file a petition for writ of error coram nobis. Ex parte Rudolph, 276 Ala. 392, 162 So.2d 486. Again the Supreme Court of the United States denied certiorari. 377 U.S. 919, 84 S.Ct. 1185, 12 L.Ed.2d 188. All of these matters, other than the filing of the petition for habeas corpus in the federal district court, antedated the decision of the Supreme Court of the United States in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, which as shown above was cited in the opinion of our Court of Appeals in Taylor v. State, supra. However, after the decision in Jackson, we re-

fused to grant a stay of execution and it was then that Rudolph's counsel filed the petition for writ of habeas corpus in the federal district court.

In Rudolph v. Holman, supra, Judge Johnson ordered Rudolph discharged from custody, subject to retrial, on the ground that in his trial in the Circuit Court of the Tenth Judicial Circuit (Jefferson County), he was denied due process of law under the Fourteenth Amendment to the Constitution of the United States in that the trial court had overruled a request of Rudolph's counsel that he be given an opportunity out of the presence of the jury to inquire into and offer evidence on the question of the admissibility of a confession. If we understand the opinion correctly, Judge Johnson considered our holding in Rudolph v. State, 275 Ala. 115, 152 So.2d 662, to the effect that the trial court did not commit reversible error in refusing to excuse the jury while the predicate was being laid for the introduction of the confession, not to be in accord with our prior decisions. We would like to record our disagreement. We have never held that it is a requirement that the jury be excused during the time evidence is offered relating to the voluntariness of a confession, insofar as we are aware. In fact, it is very unusual to review a record where such a request has been made. Perhaps that practice has been followed in some judicial circuits, but if so we are not aware of it. Alabama has been said to follow the so-called Orthodox Rule relative to the admission of confessions. See Appendix A to Mr. Justice Black's dissent in the Jackson case, supra. However, since the so-called Orthodox Rule seems to contemplate a separate hearing before the trial judge alone on the issue of voluntariness, then we have not been strictly following that rule.

We have often said, as heretofore shown, that prima facie confessions are involuntary and that there must be evidence addressed to the trial judge rebutting that presumption and showing prima facie that the confession was voluntarily made unless, of course, the circumstances attending the confessions disclose their voluntary character. Johnson v. State, 242 Ala. 278, 5 So.2d 632. But it has not been considered by this court to be a denial of any constitutional right for the evidence to be addressed to the trial judge in the presence of the jury. It has been almost the uniform custom for such evidence to be taken in the presence of the jury, but it has been considered that the determination of the voluntariness of the confession was solely for the trial court and not for the jury. However, after the confession has been admitted the jury could consider the circumstances under which the confession was obtained, and the appliances by which it was elicited, including the situation and mutual relations of the parties in exercising their exclusive prerogative of determining the credibility of the evidence, or the weight to which it is properly entitled, in controlling the formation of a verdict. Johnson v. State, supra.

In support of his holding that Rudolph was entitled to his discharge, Judge Johnson cited and quoted from Schaffer v. United States, 5 Cir., 221 F.2d 17, 54 A.L.R. 2d 820, which applied the federal rule. That was an appeal from a federal district court and we observe nothing in the opinion in that case which indicates an attempt to impose the federal rule on state courts.

This brings us to a consideration of Jackson v. Denno, supra, sometimes hereinafter referred to as the Jackson case, or Jackson. Jackson had confessed to a murder after disputed evidence had been received as to the voluntariness of that confession, in the presence of the jury, under the established New York procedure. Jackson was convicted. If we understand the so-called New York rule it is: If under no circumstances the confession could be deemed voluntary, the trial judge was obligated to exclude it. If the evidence presented a fair question of fact as to its voluntary nature, the confession was re-

ceived and the jury, under proper instruction, determined the question. After losing his appeal (People v. Jackson, 10 N.Y.2d 780, 219 N.Y.S.2d 621, 177 N.E.2d 59; amended opinion, 10 N.Y.2d 816, 221 N.Y.S. 2d 521, 178 N.E.2d 234; cert. denied, 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344), Jackson sought habeas corpus in a federal district court, asserting that his conviction was founded on a confession not properly determined to be voluntary. The writ was there denied, Application of Jackson, D.C., 206 F.Supp. 759, and the Court of Appeals affirmed, United States ex rel. Jackson v. Denno, 2 Cir., 309 F.2d 573. Certiorari was granted by the United States Supreme Court, 371 U.S. 967, 83 S.Ct. 553, 9 L.Ed. 2d 538 "to consider fundamental questions about the constitutionality of the New York procedure governing the admissibility of a confession alleged to be involuntary." 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. The Supreme Court of the United States overruled its recent case of Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522, and held that the so-called New York rule, which had been followed at Jackson's trial, was unconstitutional as a denial of due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States.

We have given careful and deliberate consideration to this decision in the Jackson case, supra, and while we realize that the Court only knocked out the so-called New York rule and apparently gave approval to the Orthodox and Massachusetts rules, nevertheless we are clear to the opinion that the New York rule was voided not only because in certain instances the question of voluntariness of the confessions was left for the jury's determination, but also because the evidence adduced relative to the voluntariness of the confession was taken before the jury.

In disposing of the case, the Supreme Court of the United States said as follows:
"Jackson's position before the District Court and here, is that the issue of his confession should not have been decided by the convicting jury but should have been determined in a proceeding separate and apart from the body trying guilt or innocence. So far we agree and hold that he is now entitled to such a hearing in the state court."

Aside from the statement which we have just quoted, there is much in the lengthy opinion which leads us to the inevitable conclusion that the Supreme Court of the United States will not uphold a conviction where the question as to the voluntariness of the confession is presented in the presence of the jury if a request for a hearing outside the presence of the jury is made.

Insofar as our research discloses, all the state courts which have considered the question have construed Jackson to so hold. People v. Jolliff, 31 Ill.2d 462, 202 N.E.2d 506; Freeman v. Gladden (Ore.), 396 P.2d 779; State v. Ortiz, 97 Ariz. 228, 399 P.2d 171; State v. Owen, 96 Ariz. 274, 394 P.2d 206; People v. Walker, 374 Mich. 331, 132 N.W.2d 87; People v. Perez, Cal.App., 42 Cal.Rptr. 161; Commonwealth ex rel. Gaito v. Moroney, 416 Pa. 199, 204 A.2d 758; People ex rel. Meadows v. McMann, 43 Misc.2d 738, 252 N.Y.S.2d 243; Lopez v. State (Ct. of Cr.App. of Tex.), 384 S.W.2d 345; State ex rel. Goodchild v. Burke, 27 Wis.2d 244, 133 N.W.2d 753.

The only case which has come to our attention wherein Jackson was construed as not requiring the trial judge to hear the evidence as to the voluntariness of the confession in the absence of the jury is Smith v. State of Texas, D.C., 236 F.Supp. 857.

Insofar as we know, there has been no precise ruling by the United States Supreme Court that Jackson v. Denno is retroactive. But in at least two instances the Supreme Court of the United States has remanded cases to state courts for further proceedings not inconsistent with the opinion in Jackson. It is apparent from a reading of the opinions in those cases that the trials at nisi prius occurred in the state

courts prior to decision in Jackson. See State of Arizona v. Owen, supra. And in United States v. Maroney, 231 F.Supp. 154, 156, it was said:

> "Furthermore, since Jackson was not a direct appeal from the conviction in the state courts but, instead, was an appeal from a collateral habeas corpus proceeding, it is evident that the rule in Jackson is to be applied retroactively."

While we agree with the application of the Jackson case made by Judge Johnson in Rudolph v. Holman, supra, and by our Court of Appeals in Taylor v. State, supra, and treating Jackson v. Denno as retroactive, we are of the opinion, since this case must be reversed on another ground, a reversal is not required on the ground that Duncan was denied due process of law in that the question as to the voluntariness of the confessions was determined in the presence of the jury. As we have shown in Rudolph v. Holman, supra, and in Taylor v. State, supra, counsel for the defendants requested that they be permitted to present evidence relating to the voluntariness of the confession outside the presence of the jury. In this case no such request was made and, moreover, there was no contradiction in the testimony adduced in the presence of the jury relative to the voluntariness of the confessions and no effort was made by counsel for the defendant to present any witness, the defendant or others, to rebut the testimony presented by the State relative to the voluntariness of the confession. If a request had been made for the question of the voluntariness of the confessions to be determined outside the presence of the jury, the trial court would no doubt have granted it because there were numerous discussions between the court and counsel outside the presence of the jury.

We feel that in fairness to the circuit bench, the prosecuting attorneys of the state and to defense counsel, we should state our views on the effect of the Jackson case, although we do this with some apprehension because there are certain areas of uncertainty.

■ We are clear to the conclusion that whenever a motion is made for the question of the voluntariness of the confession to be determined outside the presence of the jury, the motion should be granted. In such a hearing, the trial judge sitting alone should make a determination upon a proper record of the issue of voluntariness. At such a hearing the defendant may take the stand and testify for the limited purpose of making a record of his version of the facts and circumstances under which the confession was obtained. By so doing, the defendant will not waive his right to decline to take the stand in his own defense on the trial in chief nor will he waive any of the other rights stemming from his choice not to testify. If the confession is held voluntary and admitted, the jury's consideration of that confession and surrounding circumstances shall proceed in accordance with the "Orthodox" procedure, that is, the jury considers the voluntariness as affecting the weight or credibility of the confession.

■ If there is no request expressly made by counsel for the defendant that the hearing on the issue of the voluntariness of the confession be heard in the absence of the jury, we think, nevertheless, that the trial court should on his own action require such a hearing to be held if there is to be any conflict in the testimony, and particularly when the defendant desires to take the stand, because under our rule in Fikes v. State, 263 Ala. 89, 81 So.2d 303, that if a defendant takes the stand to testify to facts showing that a confession was unduly influenced "he certainly ought to respond to questions as to his guilt in fact and to any matter relevant thereto. He cannot restrict the nature of the relevant testimony he proposes to give."

The writer and Justices Goodwyn and Merrill entertain the view that the federal courts may interpret the Jackson case as

requiring that the issue of the voluntariness of the confession be determined outside the presence of the jury in all events, and for that reason would suggest to the trial courts that as a matter of precaution it might be best in the future to decide that issue in all instances outside the presence of the jury unless there has been an informed waiver. The Supreme Court of the United States in Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408, suggested that under exceptional circumstances an accused is not precluded from asserting constitutional claims even despite counsel's strategy. But there was no elaboration in the opinion of just what might constitute such circumstances. See State ex rel. Goodchild v. Burke, supra.

■ In the area of interpretation of the United States Constitution we are obliged to accept the majority view of the Supreme Court of the United States, however we may individually assess the dissents of Justices Black, Clark and Harlan, in which latter Justice Stewart joined. We say here, as the late Justice Stone said in Green v. State, 73 Ala. 26, 31:

"* * * We have uniformly, on Federal questions—those in the solution of which the Federal Supreme Court exercises a supervision of our judgments—conformed our rulings to the law as declared by that tribunal. This we have done, because, on all questions arising under the Constitution of the United States, and the acts of Congress thereunder, the rulings of that court are final, to which all State tribunals must yield. Nelson v. McCrary, 60 Ala. 301; Pollard v. State, 65 Ala. 628; Maguire v. Road Commissioners, 71 Ala. 401. We will not depart from these rulings, however much we may sometimes differ from the reasoning and conclusions of the majority of that court. * * *"

Were the confessions, all of which were made before indictment, inadmissible because Duncan did not have a lawyer present at the time the confessions were made, nor had he been advised of his right to counsel.

In Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 2d 1265, the accused, despite repeated pleas to see his attorney and after eight hours of continual questioning, was tricked into confessing by the repeated urging and misrepresentations of a friend who was a policeman. Duncan never requested a lawyer. There was no protracted questioning. There is no evidence of a repeated urging or misrepresentations of a friend or anyone else. There were other factual situations present in Spano which distinguishes it from this case, but we think those pointed out above are sufficient to show that Spano alone is not controlling here.

■ In Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, Massiah was indicted for violating the federal narcotics laws. He retained a lawyer, pleaded not guilty, and was released on bail. While he was free on bail a federal agent succeeded by surreptitious means in listening to incriminating statements made by him. Evidence of those statements was introduced against Massiah at his trial over his objections. He was convicted. The Supreme Court of the United States in reversing said:

"We hold that the petitioner was denied the basic protections of that guarantee [Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him *after he had been indicted and in the absence of his counsel.*" (Emphasis supplied.)

Since the Court expressly bypassed the question as to whether the confession was bad because of a violation of Massiah's rights under the Fourth Amendment, the words which we have italicized above seem to be the real basis of the reversal. We think it sufficient to distinguish Massiah by pointing out that the confessions in this

case came before indictment. Massiah is, of course, a case which originated in the federal court, but it no doubt applies to state courts since the right to counsel guaranteed in the federal system by the Sixth Amendment has been held to be binding upon the states by virtue of the due process guarantee of the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

The Supreme Court's decision in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, goes even further than the decision in Massiah in that it voided a confession obtained before indictment and provoked this comment or criticism in the dissenting opinion of Mr. Justice White, in which Mr. Justice Clark and Mr. Justice Stewart joined: "The decision is thus another major step in the direction of the goal which the Court seemingly has in mind—to bar from evidence all admissions obtained from an individual suspected of crime, whether involuntarily made or not." Mr. Justice Harlan filed a separate dissenting opinion.

Arrested on suspicion of murder, Escobedo was questioned by police until he confessed. Throughout the interrogation, his frequent requests to call his attorney were denied, and he was never advised by the police of his right to remain silent. The Supreme Court of the United States, in a five-to-four decision, reversed Escobedo's conviction, saying:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. at 342, 83 S.Ct. [792], at 795 [9 L.Ed.2d 799] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

In this case Duncan was not refused the services of a lawyer before he made the confessions. He did not request such services. But Duncan was not advised of his right to counsel, but was advised before he made the first confession that he did not have to submit to the examination and was told that he should do so of his free will and accord.

Although the opinion of the Court in Escobedo purports to be limited to the facts of the case, some courts have not so construed it, as Mr. Justice White, in his dissent, intimated would be the situation.

The Supreme Court of California in People v. Dorado, 40 Cal.Rptr. 264, 394 P.2d 952, has construed Escobedo as holding that, once suspicion has focused on the accused and the purpose of interrogating him is to obtain incriminating statements, such statements cannot be used against the accused, even though he did not request counsel, unless the right to counsel was intelligently waived and that no waiver can be presumed if the investigating officers did not inform the suspect of his right to counsel or his right to remain silent. For cases to the same effect, see two very recent decisions, not yet reported: State v. Mendes (R.I.), 210 A.2d 50, decided on May 10, 1965; United States ex rel. Russo v. State of New Jersey (U.S.Ct. of App., 3rd Cir.), —— F.2d ——, decided on May 20, 1965.

The Oregon Supreme Court has construed Escobedo as being authority for the proposition that an accused must be effectively warned of his constitutional right to remain silent, and that if this is not affirmatively shown by the State, a confession obtained without such warning is inadmissible. State v. Neely (Ore.), 395 P.2d 557.

To like effect is State v. Dufour (R.I.), 206 A.2d 82.

For other cases holding Escobedo to require the rejection of a confession see: Wright v. Dickson, 9 Cir., 336 F.2d 878; Clifton v. United States, 5 Cir., 341 F.2d 649; Miller v. Warden, 4 Cir., 338 F.2d 201.

In Queen v. United States, 118 U.S.App. D.C. 262, 335 F.2d 297, Escobedo was applied to a situation where an accused, prior to indictment, having requested counsel and having been given an opportunity to obtain counsel, had not done so. The accused had been advised, before making the extrajudicial self-incriminating statement, of her right not to make a statement and that if she did so it might be used against her. At the time the statement was made the accused told the investigating officers that she had obtained a lawyer, was in the process of obtaining one, or was going to do so.

 We interpret the federal cases hereinafter cited as holding that Escobedo does not prevent the use of a confession obtained before indictment, although counsel was not present, where the accused had been advised of his right to counsel or that he need not make any statement or that if a statement is made it may be used against him. Jackson v. United States, D.C.Cir., 337 F.2d 136; Long v. United States, D.C.Cir., 338 F.2d 549; United States ex rel. Townsend v. Ogilvie, 7 Cir., 334 F.2d 837; Otney v. United States, 10 Cir., 340 F.2d 696; Latham and York v. Crouse, 10 Cir., 338 F.2d 658; Davis v. North Carolina, 4 Cir., 339 F.2d 770.

In Edwards v. Holman, 5 Cir., 342 F.2d 679, that case was said to be distinguishable from Escobedo in several particulars. Among other distinguishing factors, it was pointed out that Edwards had been advised of his "constitutional rights" and Escobedo had not. But the principal point of distinction as we view it was that Edwards was no more than a suspect at the time of the interrogation, while Escobedo had become the accused at the time the confession was obtained.

Many state courts which have considered Escobedo have, in effect, limited its holding to the factual situation there presented.

In Bean v. State, 81 Nev. ——, 398 P.2d 251, in holding the confession there under consideration not to be inadmissible because of Escobedo, the court said, after quoting that part of Escobedo which we have quoted above, as follows:

> "Each of the factors specified must occur to make that case a controlling precedent. Here it is true that the investigation had begun to focus upon Bean; that he had been taken into police custody; that the police were about to commence a process of interrogation to elicit incriminating statements, and did so; that Bean was not warned of his absolute constitutional right to remain silent. However, Bean did not request counsel, nor was he denied the assistance of counsel. Absent such a request, and denial of counsel, the rule of Escobedo does not apply."

In People v. Agar, 44 Misc.2d 396, 253 N.Y.S.2d 761, it was said:

> "The nub of Escobedo is contained in the foregoing quotations, and regardless of what the ultimate determination may be, this Court holds that Escobedo decided only that *under the circumstances here,* the accused must be permitted to consult with his lawyer', to wit, a case in which he requested a lawyer or in which a lawyer was actually present and requested to see him. I interpret Escobedo as holding that a confession taken from a defendant prior to the commencement of a judicial proceeding is inadmissible where 'the police have not effectively warned him of his absolute constitutional right to remain silent' only where his lawyer is denied access to him or where 'the suspect has requested and been denied an opportunity to consult with his

lawyer'. The arrest by a police officer of a suspect is not the commencement of a judicial proceeding which precludes the admission of a confession taken in the absence of counsel as that term is used in People v. Di Biasi, 7 N.Y.2d 544, 200 N.Y.S.2d 21, 166 N.E. 2d 825; People v. Waterman, 9 N.Y.2d 561, 216 N.Y.S.2d 70, 175 N.E.2d 445, and People v. Meyer, 11 N.Y.2d 162, 227 N.Y.S.2d 427, 182 N.E.2d 103 [See People v. Fleischmann, supra, 43 Misc. 2d 200, 250 N.Y.S.2d 660].

\* \* \* \* \* \*

"It may well be that the conclusion of the Supreme Court of the State of California in Dorado will be the ultimate indisputable determination of the United States Supreme Court if the question reaches that court, as it is now constituted, but until there has been an appellate ruling to the contrary, *which is binding upon this Court,* I will continue to rule that, unless counsel is denied access to his client or the latter requests a counsel, a confession or a statement made by a defendant, under the circumstances here present is admissible against him, and that he need not be cautioned that he has a right to counsel nor that anything he says may be used against him." (253 N.Y.S.2d 763–764)

In Browne v. State, 24 Wis.2d 491, 131 N.W.2d 169, the Supreme Court of Wisconsin said of Escobedo:

"The pertinent circumstances in that case were that during the interrogation after Escobedo's arrest he repeatedly asked to speak to his lawyer and such request was denied; his lawyer came to the police station and asked the officer in charge for permission to see Escobedo; that also was denied; and the police never advised Escobedo of his constitutional right to remain silent. The only similarity between those facts and the facts present here is that defendant Browne was not advised of his constitutional right to remain silent.

He made no request to consult with an attorney nor did any attorney seek to confer with him. We deem that this fully distinguishes Escobedo and that it does not control the result here."

See State v. Winsett (Del.Super.Ct.), 205 A.2d 510; State v. Fox (Iowa), 131 N.W.2d 684; People v. Hartgraves, 31 Ill. 2d 375, 202 N.E.2d 33; Mefford v. State, 235 Md. 497, 201 A.2d 824; State v. Howard (Sup.Ct. of Mo.), 383 S.W.2d 701; State v. Smith, 43 N.J. 67, 202 A.2d 669; Turner v. State (Tex.Cr.App.), 384 S.W.2d 879; Commonwealth v. Coyle, 415 Pa. 379, 203 A.2d 782; People v. Langert, 44 Misc. 2d 399, 254 N.Y.S.2d 17; State v. Elam, 263 N.C. 273, 139 S.E.2d 601.

We will not expand Escobedo to cover a factual situation, as we have here, where the investigation had begun to focus on Duncan and he did not have counsel and was not advised of the so-called right to counsel before his confessions were made, and where he had not requested counsel and had been told, in effect, that he did; not have to make a statement. We hold that the mere fact that a lawyer was not present when the confessions were made did not render them inadmissible. If the Supreme Court of the United States had reached the point in Escobedo where it wanted to say a confession taken at such a stage before indictment was inadmissible simply because counsel for the accused was not present, it had every reason to do so, in view of the dissenting opinions. But it did not see fit to so hold.

We do not hold that Duncan was illegally detained prior to the time the confessions were made, but we observe that insofar as we are advised the so-called McNabb-Mallory rule (McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479), holding inadmissible in federal courts a confession obtained during an illegal detention, has not been made applicable to trials of criminal cases in the state courts, as yet. Gal-

legos v. State of Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (overruled on another point in Gideon v. Wainwright, supra); Stein v. People of State of New York, 346 U.S. 156, 184, 73 S.Ct. 1077, 97 L.Ed. 1522 (overruled on another point in Jackson v. Denno, supra); Ingram v. State, 252 Ala. 497, 42 So.2d 36.

As we have shown, before the confessions were admitted the State introduced evidence tending to show that no threat was made against the accused; that he was not physically mistreated; that he was not told it would be better for him to make a confession or worse for him if he did not; that no reward was offered or held out to him to get him to confess; that no inducement of any kind was made to him. This testimony was uncontradicted.

In that state of the record, we think the confessions were properly admitted in evidence unless the circumstances which antedated the confessions, along with those which prevailed at the time they were made, when considered with the age, character and situation of the defendant, demonstrate that he was deprived of his free choice to admit, to deny, or to refuse to answer. In other words, we come to a consideration of the so-called "totality of circumstances" rule sometimes applied by the Supreme Court of the United States in holding confessions improperly admitted. Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325; Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. See Phillips v. Alabama, 248 Ala. 510, 28 So.2d 542.

There is no testimony in the record which positively shows that Duncan is a white man, but we gather such to be the case from certain situations shown by the record and the pictures of his hands, although not too clear, so indicate. The record does not show his age, but he cannot be of very tender years. He had a twelve-year-old son. He is uneducated to be sure. He cannot read, but there is nothing to show with any degree of certainty that he is not mentally alert except perhaps when he has had too much to drink, and he had been in custody from February 24, 1963, until March 6th, when his first confession was made; so presumably his mental condition at the time of the confession was not affected by his weakness for alcohol. There was some testimony given by Duncan's witnesses tending to show that he was easily influenced by suggestions, but this, standing alone, does not justify the conclusion that at the time the confessions were made Duncan was not fully capable of understanding the significance of his actions.

We are unwilling to say from the record before us that he was illegally detained. Sheriff Colvard testified that he was "charged" with the offense on Monday, February 25, 1963.

The record discloses that his twelve-year-old son visited him shortly after his confinement and while the young man was, of course, not qualified to counsel his father relative to his predicament, his visit tends to show that the officials did not hold Duncan incommunicado except perhaps for the first few days after he was brought to jail.

Duncan consented to have the pictures made on Tuesday, February 26th, according to Sheriff Colvard, and there is nothing in the record to support a contrary conclusion.

Duncan was questioned by several officials on Wednesday, February 27th, but it does not appear that the interrogation was for an extended period of time, and he did not confess.

As we have shown above, the record is more or less silent as to what occurred in regard to Duncan from Wednesday, February 27th, until March 6th, the day on which he was taken to Montgomery. Certainly it does not support an inference

to the effect that he was mistreated in any way. As far as the record discloses, he was not denied food, water or cigarettes at any time. He was free to contact friends, relatives or counsel if he had so desired.

The trip to Montgomery must have been made for the purpose of having a lie detector test made. We say this because Duncan, in his statement given on Wednesday, February 27, 1965, indicated that he would be willing to submit to such a test. He seems to have voiced no objection to the trip and there is testimony to the effect that he asked to go.

Perhaps the most serious question as to the voluntariness of the confessions given in Montgomery is the possible psychological coercion upon Duncan by being carried to the polygraph or lie detector room in the Montgomery Police Department. But in view of Lieutenant Wright's testimony, we cannot conclude that Duncan was in a state of fear or confusion which amounted to coercion. He was told that he did not have to submit to the interrogation and that he should not do so except of his own free will. Lieutenant Wright's testimony stands unimpeached and the nature of his testimony impresses us with his forthrightness. And, of course, the trial judge was better circumstanced to pass on this question.

We see no objection to permitting Sheriff Colvard, and perhaps others, to view and listen to the proceedings in the polygraph room from their vantage point outside the room. The situation is different from that presented in Aaron v. State, 271 Ala. 70, 122 So.2d 360, which the writer and Justices Stakely and Coleman thought reversible error.

The circumstances connected with the confession or statement made by Duncan on March 7, 1963, after he was returned to Gadsden from Montgomery, seems to have been regular in all respects and was different from the previous statements only in immaterial respects.

If there were facts or circumstances to which Duncan could testify tending to show the involuntariness of the confessions on another trial he should be permitted to give such evidence outside the presence of the jury. Jackson v. Denno, supra.

We realize we may not have treated in detail each and every occurrence in connection with Duncan from the time of his confinement until the confessions were made, but we believe we have treated the important facts and we are unwilling to say that the confessions should have been excluded on the so-called "totality of circumstances" doctrine. We also realize that we have not treated in this opinion many of the decisions of the United States Supreme Court which apply that doctrine or rule, but to do so would only further extend this unusually long opinion and it would really serve no useful purpose because of the varying factual situations presented in those cases.

There is yet another matter which we should consider concerning the admissibility of the confessions and that is the so-called "fruit of the poisonous tree" doctrine, which is apparently imposed upon the courts of this state by Mapp v. Ohio, supra. In essence, that doctrine is to the effect that an unlawful search taints not only evidence obtained at the search, but facts discovered by a process initiated by the unlawful search. Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; United States v. Paroutian, 2 Cir., 299 F. 2d 486; United States v. Avila, D.C., 227 F.Supp. 3. This doctrine has generally been applied to cases involving searches in violation of the Fourth Amendment to the Constitution right against unlawful searches and seizures. Fahy v. State of Connecticut, supra; Wong Sun v. United States, supra; Silverthorne Lumber Co. v. United States, supra; United States v.

Paroutian, supra; United States v. Avila, supra. But it can be applied to searches in violation of a statutory right. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. It has been applied to statements. Wong Sun v. United States, supra.

For other cases applying this doctrine, see: United States v. Goldstein, 2 Cir., 120 F.2d 485, affirmed, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312; Hall v. Warden, 4 Cir., 313 F.2d 483; Takahashi v. United States, 9 Cir., 143 F.2d 118; People v. Rodriguez, 11 N.Y.2d 279, 229 N.Y.S.2d 353, 183 N.E. 2d 651; Commonwealth v. Spofford, 343 Mass. 703, 180 N.E.2d 673; State v. Kitashiro (Hawaii), 397 P.2d 558.

■ The rule, however, does not extend to facts which, although actually discovered by a process initiated by the unlawful act, were obtained independently from a source sufficiently distinguishable to be free of the taint of illegality. Wong Sun v. United States, supra; Silverthorne Lumber Co. v. United States, supra; United States v. Sheba Bracelets, Inc., 2 Cir., 248 F.2d 134, cert. denied, 355 U.S. 904, 78 S.Ct. 330, 2 L.Ed.2d 259; United States v. Rutheiser, D.C., 203 F.Supp. 891.

In United States v. Avila, supra, it was said:

"However, a mere showing that the government had sufficient independent information available so that in the normal course of events it might have discovered the questioned evidence without an illegal search cannot excuse the illegality or cure tainted matter.

"Thus, the Court should exercise great care to determine whether the asserted 'fruits of the poisoned tree' were *in fact* a product of the unlawful search—as they were held not to be in People v. Ditson, 57 Cal.2d 415, 20 Cal. Rptr. 165, 369 P.2d 714 (1962)."

■ We do not express an opinion as to whether the confessions in this case were rendered inadmissible because of the unlawful searches and seizures, but in view of another trial, we have called this doctrine to the attention of the trial court, for it is generally known that many criminal cases find their way into the federal courts after this court has affirmed, resulting in different holdings due to the application of principles of law not previously thought to be applicable to the trial of criminal cases in the state courts.

## PICTURES

■ Counsel for Duncan strenuously insist that the trial court committed reversible error in permitting the State to introduce in evidence the pictures of the body of the deceased child. Some of the pictures are indeed gruesome, as they depict the female organ of the little girl, but under the evidence in this case they were admitted without error under the previous decisions of this court.

In Harden v. State, 211 Ala. 656, 101 So. 442, it was said that "if there is any evidence tending to support a reasonable inference that the homicide was committed to conceal another crime, evidence of such other crime is admissible."

Certain it is that the evidence in this case tends to show that the person who placed the little girl in the lake did so in an effort to conceal the fact that she had been sexually molested, which fact is clearly established by the evidence. See Hall v. State, 247 Ala. 263, 24 So.2d 20; Miller v. State, 130 Ala. 1, 30 So. 379; Davis v. State, 213 Ala. 541, 105 So. 677.

The case of Cobern v. State, 273 Ala. 547, 142 So.2d 869, bears marked similarity to this case on this question of the admission in evidence of photographs of the body of the deceased. Cobern was tried for robbery, but the evidence tended to show that he killed his victim. Her body was shown to have been in a deplorable condition, her skull practically beaten to pieces, and there was a 22-caliber rifle bullet wound in the chest. The doctor testified that those two

&#8203;

injuries were sufficient to cause death. Her body was otherwise bruised and mutilated, including the puncturing of her vaginal area, evidently with a poker found in the room. During the course of the robbery prosecution, photographs of the victim's body were admitted over defendant's objection, including photographs of her vaginal area. In holding the admission of the photographs not to constitute reversible error, this court said:

"Appellant brings very cogent argument that the photographs of the victim introduced by the State were inadmissible, shed no light on the matters at issue, and were but gruesome evidence, the sole effect of which was to inflame the jury. We do not think so, and even appellant in brief 'acknowledges the fact that the Supreme Court of this state has been liberal in the admission of gruesome photographs into evidence, though the same be merely cumulative in nature.' Robbery is a crime of violence and undoubtedly the photographs of the victim, even though unsightly, were admissible as tending to illustrate the gravity of the assault. By analogy see Johnson v. State, 272 Ala. 633, 133 So.2d 53(4); Reedy v. State, 246 Ala. 363(10), 20 So.2d 528." (273 Ala. 551, 142 So.2d 871)

This is a voluminous record, consisting of three large volumes. We have not in this opinion treated anything like all of the questions presented, but we hope we have treated those which will be helpful to the court and counsel on another trial.

It is an understatement to say that the murder of Sandy Ann Scott, an innocent baby, was an atrocious and horrifying crime. Whoever committed the act, if legally responsible, of course, needs to be punished but it is axiomatic that the guilty, as well as the innocent, must be accorded due process of law. We would like to point out that the trial judge was fully conscious of that fact and exerted every effort to prevent error from getting into the trial. But the recent holdings of the United States Supreme Court have injected into the trial of criminal cases questions which are new to the courts of this state, trial and appellate courts alike.

For the errors indicated, the judgment must be reversed. It is so ordered.

Reversed and remanded.

LIVINGSTON, C. J., and GOODWYN, MERRILL and HARWOOD, JJ., concur.

SIMPSON and COLEMAN, JJ., concur specially.

COLEMAN, Justice (concurring specially).

I concur in reversal on the ground that evidence obtained by illegal search was erroneously admitted. I agree that the photographs and the evidence showing the confessions were admitted without error. As to other matters discussed I express no opinion.

SIMPSON, J., concurs in the foregoing.