HARRIS, Presiding Judge.
Appellant was put to trial upon an indictment charging murder in the second degree. He was convicted of manslaughter in the first degree and the jury fixed his punishment at ten years in the penitentiary. He was represented by counsel of his choice and at arraignment pleaded not guilty.
The evidence was in hopeless conflict. There was no request for the affirmative charge and no motion for a new trial. At the close of the State’s case there was a motion to exclude the evidence on the ground the State had failed to make out a prima facie case.
This homicide grew out of a weekend drinking spree. The deceased was heavily intoxicated. The laboratory analysis of a sample of his blood showed an alcohol level of .36 percent. Appellant, by his own admission, started drinking on Saturday night before the shooting the next afternoon and drank himself into oblivion. He sobered up some time Sunday afternoon and decided he wanted one more drink and he went to the home of the deceased in the hopes of getting that drink. There was some testimony that the wife of the deceased operated a “hit” or “shot” house, though she denied operating such a house. When appellant arrived at the house he was told by the wife *115 of the deceased that he could not have a drink because he still owed her a dollar for whiskey he bought the week before. Appellant denied that he owed her anything and at this point the deceased asked him if he was calling his wife a liar. Appellant was ordered off the premises and was followed by the deceased who was armed with a .38 caliber pistol. Appellant was also armed with a .32 caliber pistol.
The homicide occurred on April 30, 1978, at approximately 5:20 p. m. beside a parked car on Limerick Street, in the city and county of Mobile, Alabama. Appellant was arrested at his home on Houston Lane later that same evening and charged with the crime. At the time of his arrest he told the investigating officers that the gun he used to shoot the deceased was on the porch of his home. One of the officers got the pistol, wrapped it in a towel, and took it to the station house at the time the appellant was taken there. Later the officers learned that appellant had not surrendered to them the pistol that he actually used to shoot the deceased. Appellant took the deceased’s pistol from him but killed him with his own gun.
A witness for the State, Jerry Lewis Dooms, testified that the shooting took place next door to where he was living but across the street. He knew both the deceased and appellant. He stated that he was sitting in the living room when he heard several shots being fired and he went to the door and saw appellant grab the deceased by the arm and shoot him. He did not know how many times appellant fired the pistol but he estimated it was three or four times.
On cross-examination he stated that he saw appellant walk up to the deceased, grab his arm and start shooting. He further testified:
“Well, Jerry turned around towards, you know, the back of the car and, then, he just — he fell and I ran out there and grabbed him, you know, to see if he was dead, felt his pulse. I didn’t get nothing. I just laid his arm back down and that was it and Pettaway walked back to the truck with both of the guns and he left. He got in his truck and drove off.”
The wife of the victim testified that he arose around 10:00 or 10:30 on the morning of the day he was killed by appellant. He left home to get some cigarettes and was gone several hours. Mrs. Hinton stated that she didn’t see her husband drinking that day and that he did not appear to be intoxicated but he looked “funny out of the eye.” Shortly before the shooting the deceased entered his house and forced open a locked cabinet in the bathroom and obtained a pistol which was kept unloaded because of a young child in the house. Apparently the deceased loaded the pistol. In addition to the unspent bullets found in the weapon after the shooting six live rounds of .38 caliber ammunition were found in the pockets of the deceased by the personnel at the hospital. The gun used by the deceased was admitted into evidence as State’s Exhibit No. 11.
After loading the pistol the deceased got in his automobile and partially backed it into the street and left it there with the motor running. Mrs. Hinton walked to the street and saw her husband and appellant walking down the street, side by side, with her husband holding the .38 caliber gun in his hand. She heard her husband fire one round into the ground at which time she ran inside the house to call the police. While inside the house she heard what sounded like two more shots from the same weapon. She came back outside the house to the street and saw her husband and appellant approach a black Pontiac Bonneville automobile with appellant stepping to the right of this car and her husband going to the left of the car. She then saw appellant pull his gun and heard another shot which sounded lighter than the earlier shots. She immediately returned to the house to call the police again and while in the house she heard additional shots being fired which sounded like a .32 caliber pistol. Mrs. Hinton further testified that she did not see a weapon in appellant’s hand until after she observed her husband firing his pistol toward the ground. When she saw *116 the pistol in appellant’s hand both he and her husband were shooting at each other.
Clarence Dooms testified that he lived across the street from the deceased and he saw the deceased and appellant walking down the street five feet apart but side by side. During this time he saw the deceased firing his pistol into the ground several times. He then heard the deceased say to appellant, “Let’s go,” and he went back inside his house and did not see the deceased when he was actually shot. After the shooting ceased Mr. Dooms saw the deceased lying on the ground at the rear of the black Pontiac car.
It was stipulated that the cause of death was the two .32 caliber bullets removed from the body of the deceased and they were admitted into evidence. Also admitted into evidence were a .38 caliber Omega revolver, three .38 live rounds, three .38 caliber spent cartridges, as well as numerous other exhibits in the form of photographs of the scene and body of the deceased.
Ms. Alille Pillman, Director of the Mobile Crime Laboratory, whose qualifications were admitted, identified the various bullets and photographs, and stated that she examined a blood sample from the deceased, provided to her by the Coroner’s Office, and that it had a .36% ethyl alcohol content. She further stated that a person with this level of alcohol would be very, very intoxicated.
The State sought to prove a statement made by appellant while in custody which was taken by Gerard Frank Bolton, Jr., a detective with the Mobile Police Department. Detective Bolton, while assisting Sergeant Robert Moore in the investigation of the homicide, went first to the scene of the shooting and then to the home of appellant on Houston Lane approximately thirty minutes after the shooting. When he arrived at the appellant’s home he found that two other officers, Sergeant Wayne I vie and Lieutenant Mair, had appellant under' arrest and he was seated in a police patrol car. He also learned that these officers had advised appellant of the Miranda rights and warnings. Appellant was transported to the station house where Officer Bolton again advised appellant of his constitutional rights. A document entitled, “Waiver of Rights and Counsel by Defendant in Custody,” signed by appellant was admitted into evidence without objection.
Over appellant’s objection the State was permitted to prove an oral statement made by him to Officer Bolton. Officer Bolton had previously testified that at the time the waiver of rights was signed, and at the time he made the oral statement, he was intoxicated. The trial court denied repeated requests by defense counsel that all preliminary questioning and voir dire concerning the voluntariness of the statement be made out of the presence of the jury. Counsel for appellant then objected to the trial court’s action in not conducting a voir dire hearing on the voluntariness of the statement out of the presence of the jury. The court overruled the objection.
The trial court then allowed Officer Bolton to testify that appellant told him that he argued with the deceased about some money and that the deceased pulled a gun on him, that appellant pulled a knife after the deceased shot at him, and appellant took the pistol away from the deceased and shot him with his own gun.
The State then undertook to prove by Officer Robert Moore that appellant made a second statement which was reduced to writing. Officer Moore testified that he interviewed appellant after he had been advised of his rights by Officer Bolton but he did not advise him of his rights. The conversation between Officer Moore and appellant occurred about forty minutes after appellant had signed the waiver of rights form in the presence of Officer Bolton. Officer Moore stated he smelled alcohol on the breath of appellant but he did not feel that appellant was intoxicated at that time though he was not in a position to give an opinion as to the condition of appellant at the time he executed the waiver of rights form. This statement was then offered into evidence by appellant.
The statement is as follows:
*117 “STATEMENT OF: L. J. Pettaway
“REE: Murder 1st. 78004-11158
“TIME: 7:00PM 4-30-78
“Approximately 2:30PM I went over to Jerry Hinton’s house on Limrick Street. Jerry and myself talked for a while and then Jerry’s wife told me that I owed her a dollar. She said that I owed her the money for whiskey that I had got last week. I told her that I did not owe her any money. Jerry then said that I was calling his wife a liar and I told him that I was not, but I did not owe her any money. Jerry then started raising sand and I left to get in my truck. Jerry followed me to my truck and pulled a gun. I left my truck and started walking down the street. Jerry then started shooting at me. I then turned around and pulled out my little pocket knife. I told him what I would do to him. Jerry got close to me and I snatched the gun from him and then I shot him. I do not know how many times I shot him, but he fell when I shot him. I kept the gun and went to my house and waited for the Police to get there. When the Police came they asked me what my name was and when I told them who I was I walked out to the street to meet the police cars. I told them where the gun was. It was laying on the porch. The officers took the gun, wrapped in a towel, and brought the gun and myself to the Police Station. “This is a true and correct statement to the best of my knowledge and belief.
SIGNED: L. J. Pettaway
“WITNESSES:
/s/ Sgt. Robert Moore.”
Maggie L. Jackson testified that she lives at 1502 Limerick Street in Mobile and that she had been to church that Sunday morning. She returned from church around 1:30 p. m. and saw the deceased and appellant. The deceased was parked on Limerick and appellant was making an attempt to remove him from the car. She stated that appellant opened the car door but the victim closed it again and drove away. Appellant then went to his truck and got a pistol and put it down by his side.
On cross-examination this witness stated the Hintons ran a place “where people come in and buy liquor, beer, whiskey, whatever.” She said they ran a little “hit” house. She did not see any blows struck or shots fired. She did not hear any words spoken, that both men “seems like they were taking it cool, you know,” and were talking; that the deceased did not get out of his car.
Henry Bell, Jr., testified that he lived up the street from the Hinton residence, and that around 9:00 or 10:00 o’clock on the morning of the day the deceased was killed, he observed appellant drive his truck and stop it on Limerick Street. He got out of his truck and flagged the deceased down and they were having a discussion and appellant attempted to remove the deceased from his car. He was pulling on the door of deceased’s car but the deceased sped away. He then saw appellant remove something from his truck, wave it in the air, and heard him say, “I will get you.” He said he could not tell what appellant got from his truck and waved in the air. He further stated that he did not see the shooting. He went into his house and while he was lying down he heard some shots being fired. He went back outside and saw the deceased lying on the ground behind Mr. Robert Hale’s car. He did not see a weapon around the body of the deceased.
Appellant testified in his behalf and said he knew the deceased and his wife for many years. He had been in their house many times prior to the day of the shooting. He and the deceased rode to work together and came to know each other through drinking. Appellant worked on Saturday before the shooting on Sunday afternoon. He drank quite heavily Saturday night and again Sunday morning. He took a nap Sunday morning and when he awoke he started drinking again and continued to drink until he consumed all the whiskey he had in the house. Later on Sunday afternoon he decided he wanted another drink and he went to the home of the deceased to get something to drink. He said that Mrs. Hinton refused to sell him any more whiskey as he owed her a dollar for whiskey *118 from the week before. He denied he owed her for whiskey previously purchased. According to appellant’s testimony the deceased accused him of calling his wife a liar and he told the deceased that he was not calling his wife a liar and left the premises to get in his truck. As he approached the truck he was told by the deceased not to get in the truck but to get out into the street. Appellant looked back and saw the deceased with a gun in his hand, that deceased started firing it, and told appellant to put his hands up. As they walked down the street the deceased cursed him and told him he was going to kill him. After the deceased fired his gun the third time appellant pulled his pistol from his pocket and turned toward the deceased and started firing. As the deceased started falling appellant took both guns and went home. When the police arrived he told them the pistol he used to shoot the deceased was on his porch and the police got the pistol and placed it in a towel and he was taken to police headquarters. The pistol which the police got from appellant’s porch was a .38 caliber pistol which belonged to the deceased and was not the pistol he used to shoot the deceased. The police found out much later that appellant told them a lie about the pistol he used to kill the deceased. He finally admitted that he told the officers a lie because he was scared. Appellant further stated that as far as he knew he never went to the house of the deceased prior to the shooting.
On cross-examination appellant denied that he and the deceased were walking side by side but that he was a few feet in front of him when the deceased was shooting his pistol. He did not know in what direction the deceased was firing his pistol. He admitted that he shot the deceased three times. After he shot the deceased the first time he saw him lean over and he shot him the second time and observed him lean over further and then he shot him the third time and saw him fall. He then took the pistol from the deceased and went home. He denied pulling a knife on the deceased and denied that he grabbed him by the arm and held him while he was shooting.
He said that State witnesses Maggie L. Jackson, Henry Bell, Jr., and Jerry Lewis Dooms were untruthful in their testimony. He admitted that he did not tell the officers the truth as he was just afraid. He felt that he was acting in self-defense in shooting the deceased.
There are only two issues presented on this appeal seeking a reversal. Appellant strongly contends the trial court erred in overruling his motion to determine the vol-untariness of his alleged confession on a voir dire hearing out of the presence and hearing of the jury. We agree.
In Duncan v. State, 278 Ala. 145, 176 So.2d 840, the Supreme Court of Alabama, relying on Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 held:
“We are clear to the conclusion that whenever a motion is made for the question of the voluntariness of the confession to be determined outside the presence of the jury, the motion should be granted. In such a hearing, the trial judge sitting alone should make a determination upon a proper record of the issue of voluntariness. At such a hearing the defendant may take the stand and testify for the limited purpose of making a record of his version of the facts and circumstances under which the confession was obtained. By so doing, the defendant will not waive his right to decline to take the stand in his own defense on the trial in chief nor will he waive any of the other rights stemming from his choice not to testify. If the confession is held voluntary and admitted, the jury’s consideration of that confession and surrounding circumstances shall proceed in accordance with the ‘Orthodox’ procedure, that is, the jury considers the voluntariness as affecting the weight or credibility of the confession.”
In disposing of the Jackson case the Supreme Court of the United States stated:
“Jackson’s position before the District Court and here, is that the issue of his confession should not have been decided by the convicting jury but should have been determined by a proceeding separate and apart from the body trying guilt *119 or innocence. So far we agree and hold that he is now entitled to such a hearing in the state.”
In Duncan, supra, the Court went on to say:
“Aside from the statement which we have just quoted, there is much in the lengthy opinion which leads us to the inevitable conclusion that the Supreme Court of the United States will not uphold a conviction where the question as to the voluntariness of the confession is presented in the presence of the jury if a request for a hearing outside the presence of the jury is made.” (Emphasis supplied.)
The Court further noted in Duncan, supra, that all the State courts which have considered the question have construed Jackson to so hold. (Citing ten State cases).
In Taylor v. State, 42 Ala.App. 634, 174 So.2d 795, the Court held:
“The confession of an accused in a criminal case is prima facie involuntary, and therefore inadmissible unless affirmatively shown by the prosecution to have been made voluntarily; and admissibility of the confession is determined by the trial court. Phillips v. State, 248 Ala. 510, 28 So.2d 542.
“Before the voluntariness of the confession is determined by the trial court, the court should receive and hear any testimony offered by the accused tending to show that the confession was not made voluntarily. Jackson v. State, 83 Ala. 76, 3 So. 847; White v. State, 260 Ala. 328, 70 So.2d 624, and the accused should be given the opportunity to present such testimony on voir dire, in the absence of the jury.” (citations omitted)
To the same effect is the holding of this ' court in Reynolds v. State, Ala.Cr.App., 346 So.2d 979, wherein Judge Bowen held that the proper procedure for determining the admissibility of a proposed confession is for the defense attorney to move to suppress and for the trial court to hold a voir dire examination outside the presence of the jury.
We hold the trial court erred to a reversal in refusing to grant appellant’s motion to hold a voir dire hearing out of the presence and hearing of the jury.
In view of our holding we do not deem it necessary to treat appellant’s other contention for a reversal.
REVERSED AND REMANDED.
All the Judges concur.